**YUSUF AHMED ALGHANIM & SONS, W.L.L., Petitioner–Appellee,**

v.

**TOYS "R" US, INC.; TRU (HK) Limited, Respondents–Appellants.**

No. 1757, Docket 96–9692.

United States Court of Appeals, Second Circuit.

Argued June 25, 1997.

Decided Sept. 10, 1997.

Michael S. Feldberg, Schulte Roth & Zabel LLP, New York City (Antoinette Passanante, Schulte Roth & Zabel LLP, Dennis J. Block, Stephen A. Radin, Weil, Gotshal & Manges, New York City, of counsel), for Respondents–Appellants.

Joseph D. Pizzurro, Curtis, Mallet–Prevost, Colt & Mosle, New York City (Herbert M. Lord, Michelle A. Rice, Curtis, Mallet–Prevost, Colt & Mosle, New York City, of counsel), for Petitioner–Appellee.

Before: MINER and McLAUGHLIN, Circuit Judges, and SCULLIN; District Judge.*

MINER, Circuit Judge.

Appeal from a judgment entered in the United States District Court for the Southern District of New York (McKenna, J.) denying respondents' cross-motion to vacate or modify an arbitration award and granting the petition to confirm the award. The court found that while the petition for confirmation was brought under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, respondents' cross-motion to vacate or modify the award was properly brought under the Federal Arbitration Act, and thus those claims were governed by the Federal Arbitration Act's implied grounds for vacatur. Nonetheless, the court granted

---

* The Honorable Frederick J. Scullin, Jr. of the United States District Court for the Northern District of New York, sitting by designation.

the petition to confirm the award, finding that respondents' allegations of error in the arbitral award were without merit.

For the reasons that follow, we affirm.

## BACKGROUND

In November of 1982, respondent-appellant Toys "R" Us, Inc. (collectively with respondent-appellant TRU (HK) Limited, "Toys 'R' Us") and petitioner-appellee Yusuf Ahmed Alghanim & Sons, W.L.L. ("Alghanim"), a privately owned Kuwaiti business, entered into a License and Technical Assistance Agreement (the "agreement") and a Supply Agreement. Through the agreement, Toys "R" Us granted Alghanim a limited right to open Toys "R" Us stores and use its trademarks in Kuwait and 13 other countries located in and around the Middle East (the "territory"). Toys "R" Us further agreed to supply Alghanim with its technology, expertise and assistance in the toy business.

From 1982 to the December 1993 commencement of the arbitration giving rise to this appeal, Alghanim opened four toy stores, all in Kuwait. According to Toys "R" Us, the first such store, opened in 1983, resembled a Toys "R" Us store in the United States, but the other three, two of which were opened in 1985 and one in 1988, were small storefronts with only limited merchandise. It is uncontested that Alghanim's stores lost some $6.65 million over the 11-year period from 1982 to 1993, and turned a profit only in one year of this period.

Following the Gulf War, both Alghanim and Toys "R" Us apparently concluded that their relationship needed to be altered. Representatives of Alghanim and Toys "R" Us's International Division met in September of 1991 and February of 1992. Alghanim expressed a desire for Toys "R" Us to contribute capital toward Alghanim's expansion into other countries. Alghanim advised that it would be willing to proceed in the business only under a new joint venture agreement that would shift a substantial portion of responsibility for capital expenditures to Toys "R" Us. Toys "R" Us was unwilling to take on a greater portion of this responsibility.

On July 20, 1992, Toys "R" Us purported to exercise its right to terminate the agreement, sending Alghanim a notice of non-renewal stating that the agreement would terminate on January 31, 1993. Alghanim responded on July 30, 1992, stating that because its most recently opened toy store had opened on January 16, 1988, the initial term of the agreement ended on January 16, 1993. Alghanim asserted that Toys "R" Us's notice of non-renewal was four days late in providing notice six months before the end of the initial period. According to Alghanim, under the termination provision of the agreement, Toys "R" Us's failure to provide notice more than six months before the fifth year after the opening of the most recent store automatically extended the term of the agreement for an additional two years, until January 16, 1995.

On September 2, 1992, Toys "R" Us sent a second letter. Toys "R" Us explained that, on further inspection of the agreement, it had determined that the initial term of the agreement expired on December 31, 1993, and it again gave notice of non-renewal. In this letter, Toys "R" Us also directed Alghanim not to open any new toy stores and warned that failure to comply with that direction could constitute a breach of the agreement.

Through the balance of 1992 and 1993, the parties unsuccessfully attempted to renegotiate the agreement or devise a new arrangement. In September of 1993, the parties discussed Alghanim's willingness to relinquish its rights under the agreement. In one discussion, Amin Kadrie, Alghanim's chief operating officer and the head of its toy business, offered to "release the business right now" if Toys "R" Us would "give us $2 million for the losses we've incurred [in] trying to develop this business." (J.A. 457.) Toys "R" Us declined, offering instead to buy Alghanim's inventory at Alghanim's cost. The parties could not agree upon a reconciliation.

At the end of 1993, Toys "R" Us contracted with Al–Futtaim Sons Co., LLC ("Al–Futtaim") for the post-Alghanim rights to open Toys "R" Us stores in five of the countries under the agreement, including Kuwait,

and with ATA Development Co. ("ATA") for the post-Alghanim rights to open Toys "R" Us stores in Saudi Arabia. These two companies initially offered $30 million for the rights, and eventually paid a total of $22.5 million.

On December 20, 1993, Toys "R" Us invoked the dispute-resolution mechanism in the agreement, initiating an arbitration before the American Arbitration Association. Toys "R" Us sought a declaration that the agreement was terminated on December 31, 1993. Alghanim responded by counterclaiming for breach of contract.

On May 4, 1994, the arbitrator denied Toys "R" Us's request for declaratory judgment. The arbitrator found that, under the termination provisions of the agreement, Alghanim had the absolute right to open toy stores, even after being given notice of termination, as long as the last toy store was opened within five years. The parties then engaged in substantial document and expert discovery, motion practice, and a 29–day evidentiary hearing on Alghanim's counterclaims.

On July 11, 1996, the arbitrator awarded Alghanim $46.44 million for lost profits under the agreement, plus 9 percent interest to accrue from December 31, 1994. The arbitrator's findings and legal conclusions were set forth in a 47–page opinion.

Alghanim petitioned the district court to confirm the award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("Convention"), 21 U.S.T. 2517, 330 U.N.T.S. 38, reprinted at 9 U.S.C. § 201.[1] Toys "R" Us cross-moved to vacate or modify the award under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., arguing that the award was clearly irrational, in manifest disregard of the law, and in manifest disregard of the terms of the agreement. The district court concluded that "[t]he Convention and the FAA afford overlapping coverage, and the fact that a petition to confirm is brought under the Convention does not foreclose a cross-motion to vacate under the FAA, and

the Court will consider [Toys "R" Us's] cross-motion under the standards of the FAA." (J.A. 569–70 (citation omitted).) By judgment entered December 20, 1996, the district court confirmed the award, finding Toys "R" Us's objections to the award to be without merit. This appeal followed.

## DISCUSSION

### I. Availability of the FAA's Grounds for Relief in Confirmation Under the Convention

Toys "R" Us argues that the district court correctly determined that the provisions of the FAA apply to its cross-motion to vacate or modify the arbitral award. In particular, Toys "R" Us contends that the FAA and the Convention have overlapping coverage. Thus, Toys "R" Us argues, even though the petition to confirm the arbitral award was brought under the Convention, the FAA's implied grounds for vacatur should apply to Toys "R" Us's cross-motion to vacate or modify because the cross-motion was brought under the FAA. We agree that the FAA governs Toys "R" Us's cross-motion.

#### A. Applicability of the Convention

■ Neither party seriously disputes the applicability of the Convention to this case and it is clear to us that the Convention does apply. The Convention provides that it will

apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards *not considered as domestic awards* in the State where their recognition and enforcement are sought.

Convention art. I(1) (emphasis added). The Convention does not define nondomestic awards. *See Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir.1983). How-

1. The Convention, frequently referred to as the "New York Convention" or the "1958 Convention," was enacted and opened for signature in New York City on June 10, 1958, and entered into force in the United States after ratification on December 29, 1970, as codified at 9 U.S.C. §§ 201–208.

ever, 9 U.S.C. § 202, one of the provisions implementing the Convention, provides that

[a]n agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

In *Bergesen*, we held "that awards 'not considered as domestic' denotes awards which are subject to the Convention not because made abroad, but because made within the legal framework of another country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction." 710 F.2d at 932 (quoting 9 U.S.C. § 201). The Seventh Circuit similarly has interpreted § 202 to mean that "any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention." *Jain v. de Méré*, 51 F.3d 686, 689 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 300, 133 L.Ed.2d 206 (1995).

The Convention's applicability in this case is clear. The dispute giving rise to this appeal involved two nondomestic parties and one United States corporation, and principally involved conduct and contract performance in the Middle East. Thus, we consider the arbitral award leading to this action a nondomestic award and thus within the scope of the Convention.

*B. Authority Under the Convention to Set Aside An Award Under Domestic Arbitral Law*

█ Toys "R" Us argues that the district court properly found that it had the authority under the Convention to apply the FAA's implied grounds for setting aside the award. We agree.

Under the Convention, the district court's role in reviewing a foreign arbitral award is strictly limited: "The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207; *see Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 699 n. 11 (2d Cir.1978). Under Article V of the Convention, the grounds for refusing to recognize or enforce an arbitral award are:

(a) The parties to the agreement ... were ... under some incapacity, or the said agreement is not valid under the law ...; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings ...; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration ...; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties ...; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

Convention art. V(1). Enforcement may also be refused if "[t]he subject matter of the difference is not capable of settlement by arbitration," or if "recognition or enforcement of the award would be contrary to the public policy" of the country in which enforcement or recognition is sought. *Id.* art. V(2). These seven grounds are the only grounds explicitly provided under the Convention.

In determining the availability of the FAA's implied grounds for setting aside, the text of the Convention leaves us with two questions: (1) whether, in addition to the Convention's express grounds for refusal, other grounds can be read into the Convention by implication, much as American courts have read implied grounds for relief into the FAA, and (2) whether, under Article V(1)(e), the courts of the United States are autho-

rized to apply United States procedural arbitral law, i.e., the FAA, to nondomestic awards rendered in the United States. We answer the first question in the negative and the second in the affirmative.

### 1. Availability Under the Convention of Implied Grounds for Refusal

■ We have held that the FAA and the Convention have "overlapping coverage" to the extent that they do not conflict. *Bergesen,* 710 F.2d at 934; *see* 9 U.S.C. § 208 (FAA may apply to actions brought under the Convention "to the extent that [the FAA] is not in conflict with [9 U.S.C. §§ 201–208] or the Convention as ratified by the United States"); *Lander Co. v. MMP Invs., Inc.,* 107 F.3d 476, 481 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 55, —— L.Ed.2d ——, (1997). However, by that same token, to the extent that the Convention prescribes the exclusive grounds for relief from an award under the Convention, that application of the FAA's implied grounds would be in conflict, and is thus precluded. *See, e.g., M & C Corp. v. Erwin Behr GmbH & Co., KG,* 87 F.3d 844, 851 (6th Cir.1996)

In *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (Rakta),* 508 F.2d 969 (2d Cir.1974), we declined to decide whether the implied defense of "manifest disregard" applies under the Convention, having decided that even if it did, appellant's claim would fail. *See id.* at 977. Nonetheless, we noted that "[b]oth the legislative history of Article V and the statute enacted to implement the United States' accession to the Convention are strong authority for treating as exclusive the bases set forth in the Convention for vacating an award." *Id.* (citation and footnote omitted).

There is now considerable caselaw holding that, in an action to confirm an award rendered in, or under the law of, a foreign jurisdiction, the grounds for relief enumerated in Article V of the Convention are the only grounds available for setting aside an

arbitral award. *See, e.g., M & C,* 87 F.3d at 851 (concluding that the Convention's exclusive grounds for relief "do not include miscalculations of fact or manifest disregard of the law"); *International Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Industrial Y Comercial,* 745 F.Supp. 172, 181–82 (S.D.N.Y.1990) (refusing to apply a "manifest disregard of law" standard on a motion to vacate a foreign arbitral award); *Brandeis Intsel Ltd. v. Calabrian Chems. Corp.,* 656 F.Supp. 160, 167 (S.D.N.Y.1987) ("In my view, the 'manifest disregard' defense is not available under Article V of the Convention or otherwise to a party ... seeking to vacate an award of foreign arbitrators based upon foreign law."); *see also* Albert Jan van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 265 (1981) ("*the grounds mentioned in Article V are exhaustive*"). This conclusion is consistent with the Convention's pro-enforcement bias. *See, e.g., Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519–20 & n. 15, 94 S.Ct. 2449, 2457 & n. 15, 41 L.Ed.2d 270 (1974); *Parsons,* 508 F.2d at 973. We join these courts in declining to read into the Convention the FAA's implied defenses to confirmation of an arbitral award.

### 2. Nondomestic Award Rendered in the United States

■ Although Article V provides the exclusive grounds for refusing confirmation under the Convention, one of those exclusive grounds is where "[t]he award ... has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Convention art. V(1)(e). Those courts holding that implied defenses were inapplicable under the Convention did so in the context of petitions to confirm awards rendered abroad. These courts were not presented with the question whether Article V(1)(e) authorizes an action to set aside an arbitral award under the domestic law of the state in which, or under which, the award was rendered.[2] We,

---

2. In both *Celulsa Del Pacifico S.A. v. A. Ahlstrom Corp.,* No. 95 Civ. 9586, 1996 WL 103826 (S.D.N.Y. Mar. 11, 1996), and *Avraham v. Shigur Express Ltd.,* No. 91 Civ. 1238, 1991 WL 177633

(S.D.N.Y. Sept. 4, 1991), district courts in this Circuit refused to recognize the applicability of the FAA's implied grounds for relief to nondomestic awards that had been rendered in the

however, are faced head-on with that question in the case before us, because the arbitral award in this case was rendered in the United States, and both confirmation and vacatur were then sought in the United States.

We read Article V(1)(e) of the Convention to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award. The district court in *Spector v. Torenberg*, 852 F.Supp. 201 (S.D.N.Y.1994), reached the same conclusion as we do now, reasoning that, because the Convention allows the district court to refuse to enforce an award that has been vacated by a competent authority in the country where the award was rendered, the court may apply FAA standards to a motion to vacate a nondomestic award rendered in the United States. *See id.* at 205–06 & n. 4.

The Seventh Circuit has agreed, albeit in passing, that the Convention "contemplates the possibility of the award's being set aside in a proceeding under local law." *Lander*, 107 F.3d at 478 (citing Article V(1)(e)). Likewise, the United States District Court for the District of Columbia has found that, in an arbitration conducted in Egypt and under Egyptian law, nullification of the award by the Egyptian courts falls within Article V(1)(e). *See Chromalloy Aeroservices v. Arab Republic of Egypt*, 939 F.Supp. 907, 909 (D.D.C.1996).

Our conclusion also is consistent with the reasoning of courts that have refused to apply non-Convention grounds for relief where awards were rendered outside the United States. For example, the Sixth Circuit in *M & C* concluded that it should not apply the FAA's implied grounds for vacatur, because the United States did not provide the law of

the arbitration for the purposes of Article V(1)(e) of the Convention. 87 F.3d at 849. Similarly, in *International Standard*, the district court decided that only the state under whose procedural law the arbitration was conducted has jurisdiction under Article V(1)(e) to vacate the award, whereas on a petition for confirmation made in any other state, only the defenses to confirmation listed in Article V of the Convention are available. 745 F.Supp. at 178.

This interpretation of Article V(1)(e) also finds support in the scholarly work of commentators on the Convention and in the judicial decisions of our sister signatories to the Convention. There appears to be no dispute among these authorities that an action to set aside an international arbitral award, as contemplated by Article V(1)(e), is controlled by the domestic law of the rendering state.[3] As one commentator has explained:

> The possible effect of this ground for refusal [Article V(1)(e) ] is that, as the award can be set aside in the country of origin on *all* grounds contained in the arbitration law of that country, including the public policy of that country, the grounds for refusal of enforcement under the Convention may indirectly be extended to include all kinds of particularities of the arbitration law of the country of origin. This might undermine the limitative character of the grounds for refusal listed in Article V ... and thus decrease the degree of uniformity existing under the Convention.

van den Berg, *supra*, at 355; *see also* Case No. 2 Nd 502/80 (Feb. 1, 1980) (Aus.), *excerpted in* 7 Y.B. Com. Arb. 312, 313 (1982) (in action to set aside an arbitral award, court applies "the law of the country in which the award has been made"). The defense in Article V(1)(e)

---

United States and were subject to confirmation under the Convention. However, in neither case did the district court address the significance of Article V(1)(e).

**3.** Although most courts and commentators assume that Article V(1)(e) is applicable to the state in which the award is rendered, we note that Article V(1)(e) specifically contemplates the possibility that an award could be rendered in one

state, but under the arbitral law of another state. *See* Convention art. V(1)(e) ("or has been set aside or suspended by a competent authority of the country in which, *or under the law of which*, that award was made" (emphasis added)). In the rare instance where that is the case, Article V(1)(e) would apply to the state that supplied the arbitral law under which the award was made. *See, e.g.,* van den Berg, *supra*, at 350. This situation may be so rare as to be a "dead letter." *See id.* at 28.

incorporates the entire body of review rights in the issuing jurisdiction.... If the scope of judicial review in the rendering state extends beyond the other six defenses allowed under the New York Convention, the losing party's opportunity to avoid enforcement is automatically enhanced: The losing party can first attempt to derail the award on appeal on grounds that would not be permitted elsewhere during enforcement proceedings.

Daniel M. Kolkey, *Attacking Arbitral Awards: Rights of Appeal and Review in International Arbitrations*, 22 Int'l Law. 693, 694 (1988).

Indeed, many commentators and foreign courts have concluded that an action to set aside an award can be brought *only* under the domestic law of the arbitral forum, and can never be made under the Convention. *See Shenzhen Nan Da Indus. & Trade United Co. v. FM Int'l Ltd.*, 1992 H.K. Law Digest C6 (Sup.Ct.H.K. Mar. 2, 1991), *excerpted in* 18 Y.B. Com. Arb. 377, 382 (1993) ("Various decisions have made clear that the Convention is not applicable for setting aside awards. The court of the country of origin of the award is the only court competent to rule."); van den Berg, *supra*, at 20 ("[T]he Convention is not applicable in the action for setting aside the award."); *id.* ("These provisions affirm the well-established principle of current international commercial arbitration that the court of the country of origin is exclusively competent to decide on the setting aside of the award."); Jan Paulsson, *The Role of Swedish Courts in Transnational Commercial Arbitration*, 21 Va. J. Int'l L. 211, 242 (1981) ("[T]he fact is that setting aside awards under the New York Convention can take place only in the country in which the award was made.").

There is no indication in the Convention of any intention to deprive the rendering state of its supervisory authority over an arbitral award, including its authority to set aside that award under domestic law. The Convention succeeded and replaced the Convention on the Execution of Foreign Arbitral Awards ("Geneva Convention"), Sept. 26, 1927, 92 L.N.T.S. 301. The primary defect of the Geneva Convention was that it required

an award first to be recognized in the rendering state before it could be enforced abroad, *see* Geneva Convention arts. 1(d), 4(2), 92 L.N.T.S. at 305, 306, the so-called requirement of "double *exequatur.*" *See* Jane L. Volz & Roger S. Haydock, *Foreign Arbitral Awards: Enforcing the Award Against the Recalcitrant Loser*, 21 Wm. Mitchell L.Rev. 867, 876–77 (1996); W. Laurence Craig, *Some Trends and Developments in the Laws and Practice of International Commercial Arbitration*, 30 Tex. Int'l L.J. 1, 9 (1995). This requirement "was an unnecessary time-consuming hurdle," van den Berg, *supra*, at 267, and "greatly limited [the Geneva Convention's] utility," Craig, *supra*, at 9.

The Convention eliminated this problem by eradicating the requirement that a court in the rendering state recognize an award before it could be taken and enforced abroad. In so doing, the Convention intentionally "liberalized procedures for enforcing foreign arbitral awards," Volz & Haydock, *supra*, at 878; *see Scherk*, 417 U.S. at 519–20 & n. 15, 94 S.Ct. at 2457 & n. 15; *Parsons*, 508 F.2d at 973 (noting "[t]he general pro-enforcement bias informing the Convention and explaining its supersession of the Geneva Convention").

■ Nonetheless, under the Convention, the power and authority of the local courts of the rendering state remain of paramount importance. "What the Convention did not do ... was provide any international mechanism to insure the validity of the award where rendered. This was left to the provisions of local law. The Convention provides no restraint whatsoever on the control functions of local courts at the seat of arbitration." Craig, *supra*, at 11. Another commentator explained:

> Significantly, [Article V(1)(e) ] fails to specify the grounds upon which the rendering State may set aside or suspend the award. While it would have provided greater reliability to the enforcement of awards under the Convention had the available grounds been defined in some way, such action would have constituted meddling with national procedure for handling domestic awards, a subject beyond the competence of the Conference.

Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 70 Yale L.J. 1049, 1070 (1961). From the plain language and history of the Convention, it is thus apparent that a party may seek to vacate or set aside an award in the state in which, or under the law of which, the award is rendered. Moreover, the language and history of the Convention make it clear that such a motion is to be governed by domestic law of the rendering state, despite the fact that the award is non-domestic within the meaning of the Convention as we have interpreted it in *Bergesen,* 710 F.2d at 932.

In sum, we conclude that the Convention mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought. The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief. *See* Convention art. V(1)(e). However, the Convention is equally clear that when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.

## II. Application of FAA Grounds for Relief

Having determined that the FAA does govern Toys "R" Us's cross-motion to vacate, our application of the FAA's implied grounds for vacatur is swift. The Supreme Court has stated "that courts of appeals should apply ordinary, not special, standards when reviewing district court decisions upholding arbitration awards." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 948, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995). We review the district court's findings of fact for clear error and its conclusions of law *de novo. See id.*

"[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitra-

tion award a judgment of the court." *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 176 (2d Cir.1984). The review of arbitration awards is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993). Accordingly, "the showing required to avoid summary confirmance is high." *Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir.1987).

More particularly, "[t]his court has generally refused to second guess an arbitrator's resolution of a contract dispute." *John T. Brady & Co. v. Form–Eze Sys., Inc.,* 623 F.2d 261, 264 (2d Cir.1980). As we have explained: "An arbitrator's decision is entitled to substantial deference, and the arbitrator need only explicate his reasoning under the contract 'in terms that offer even a barely colorable justification for the outcome reached' in order to withstand judicial scrutiny." *In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir.1988) (quoting *Andros Compania,* 579 F.2d at 704).

However, awards may be vacated, *see* 9 U.S.C. § 10, or modified, *see id.* § 11, in the limited circumstances where the arbitrator's award is in manifest disregard of the terms of the agreement, *see Leed Architectural Prods., Inc. v. United Steelworkers, Local 6674,* 916 F.2d 63, 65–66 (2d Cir.1990), or where the award is in "manifest disregard of the law," *Fahnestock & Co. v. Waltman,* 935 F.2d 512, 515–16 (2d Cir.1991); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933–34 (2d Cir.1986). We find that neither of these implied grounds is met in the present case.

### A. Manifest Disregard of the Law

Toys "R" Us argues that the arbitrator manifestly disregarded New York law on lost profits awards for breach of contract by returning a speculative award. This contention is without merit. "[M]ere error in the law or failure on the part of the arbitrator[ ] to understand or apply the law" is not sufficient to establish manifest disregard of the law. *Fahnestock,* 935 F.2d at 516 (quotations

omitted). For an award to be in "manifest disregard of the law,"

> [t]he error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.

*Merrill Lynch,* 808 F.2d at 933.

In the instant case, the arbitrator was well aware of and carefully applied New York's law on lost profits.[4] The arbitrator specifically addressed *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986), which contains New York's law on the subject and upon which Toys "R" Us relied in its arguments,[5] and concluded:

> I do not think the Kenford case rules out damages in this case. Kenford disallowed damages based on future profits from concessions in a domed stadium that was never built.... In this case [Alghanim], which is forced into the estimating posture because of [Toys "R" Us's] breach, bases its damages not on its own experience but on [Toys "R" Us's]. [Toys "R" Us] has hundreds of toy stores worldwide. Since it has been found that the Agreements require [Toys "R" Us] to provide a wide variety of services, similar to what it provides its own toy stores, I find that [Alghanim's] method of estimating damages is reasonable and believable, and provides a sound basis on which to fashion the award.

(J.A. 557.) We find no manifest disregard of the law in this analysis.

■ Toys "R" Us also argues that the arbitrator manifestly disregarded the law of lost profits by ignoring the facts that (1) Alghanim's toy business had lost a total of $6.65 million over the course of its existence under the agreement, and (2) Alghanim itself offered to relinquish its rights for $2 million. Toys "R" Us further contends that the calculation of lost profits was irrational. We reject these contentions as well.

The fact that Alghanim lost $6.65 million over ten years does not make the arbitrator's award of future lost profits of $46 million "completely irrational." Past losses do not necessarily negate any expectation of future profits. *See, e.g., Lamborn v. Dittmer,* 873 F.2d 522, 533 (2d Cir.1989) ("[W]e reject outright the suggestion in Dittmer's papers that a business with no history of profits is necessarily valueless.").

As to the purported $2 million buyout offer, no witness has testified that the $2 million figure was an estimate of the value of Alghanim's toy business. Kadrie, the primary Alghanim officer involved with the toy business, testified that, in his understanding, settlement with Toys "R" Us would serve to provide Alghanim "some relief on the cost of liquidating [its] inventory." (J.A. 405–06.) Accordingly, Alghanim argues that $2 million was the value Alghanim placed on its inventory at the time. Furthermore, according to a Toys "R" Us executive, Kadrie, in making this offer, expressly stated that the $2 million was to recoup losses Alghanim had incurred in trying to develop the business. Therefore, there is no proof that this figure was Alghanim's, or anyone else's, estimation of the value of the business. Thus, the arbitrator did not manifestly disregard lost profits law in refusing to treat the $2 million figure as a buyout offer.

We also reject Toys "R" Us's contention that the arbitrator's calculation of lost profits was in manifest disregard of the law. Toys "R" Us contends that the actual operating results of the Toys "R" Us stores in the territory since the breach of the agreement have been lower than the arbitrator's valuation would suggest. The arbitrator explicitly addressed this issue, reasoning that

---

4. There is no dispute that New York law controls.

5. In *Kenford,* lost profits were unavailable to the prevailing party because such an award would "require speculation and conjecture, making it beyond the capability of even the most sophisti-cated procedures to satisfy the legal requirements of proof with reasonable certainty." 67 N.Y.2d at 262, 502 N.Y.S.2d 131, 493 N.E.2d 234; *see Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 425, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996).

[Alghanim's] damages are to be calculated as of September 2, 1992 and are based on what its rights were worth at that time. More importantly, since the start of this case in late 1993 it has been clear that large stakes are involved and that [Toys "R" Us's] actual results of operations in the Middle East could have a bearing on this case. The record does not provide a sufficient basis to disentangle [Toys "R" Us's] actual results ... from what might have been the business results of [Toys "R" Us's] Mid–East venture if this case had never existed.

(J.A. 558.) There is no manifest disregard in the arbitrator's refusal to credit actual operating results for the period following the breach in calculating the value of the business at the time of the breach.

Toys "R" Us also argues that the arbitrator was wholly irrational in calculating the value of the Saudi Arabian rights as the $15 million ATA initially offered for those rights, when ultimately ATA only paid $7.5 million. However, the fact that a disinterested third party valued the Saudi Arabian rights at $15 million near the time of the breach provides a rational basis for accepting that valuation. Therefore, we see no manifest disregard in the arbitrator's use in his calculations of the bid price, rather than the actual closing price, for the sale to ATA. Thus, we see no merit in Toys "R" Us's contentions of manifest disregard of the law.

### B. Manifest Disregard of the Agreement

Toys "R" Us also argues that the district court erred in refusing to vacate the award because the arbitrator manifestly disregarded the terms of the agreement. In particular, Toys "R" Us disputes the arbitrator's interpretation of four contract terms: (1) the termination provision; (2) the conforming stores provision; (3) the non-assignment provision; and (4) the deletion provision. We find no error.

■ Interpretation of these contract terms is within the province of the arbitrator and will not be overruled simply because we disagree with that interpretation. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362,

4 L.Ed.2d 1424 (1960). We will overturn an award where the arbitrator merely "mak[es] the right noises—noises of contract interpretation—" while ignoring the clear meaning of contract terms. *In re Marine Pollution*, 857 F.2d at 94 (quotation omitted). We apply a notion of "manifest disregard" to the terms of the agreement analogous to that employed in the context of manifest disregard of the law.

■ As to each of these contract provisions, Toys "R" Us merely takes issue with the arbitrator's well-reasoned interpretations of those provisions, and simply offers its own contrary interpretations. Toys "R" Us does not advance a convincing argument that the arbitrator manifestly disregarded the agreement. We will not overturn the arbitrator's award merely because we do not concur with the arbitrator's reading of the agreement. For the reasons stated by the district court, we find the arbitrator's interpretation of the contractual provisions supportable.

We have carefully considered Toys "R" Us's remaining contentions and find them all to be without merit.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.