**Martin I. SPIER, Petitioner,**

v.

**CALZATURIFICIO TECNICA, S.p.A., Respondent.**

**No. 86 CIV. 3447 (CSH).**

United States District Court, S.D. New York.

Oct. 22, 1999.

**280**

David A. Botwinik, Pavia & Haracourt, New York, NY, for Petitioner.

David R. Foley, Manatt Phelps Phillips, Palo Alto, CA, Jeremy D. Richardson, Phillips, Nizer, Benjamin, Krim & Ballon, LLP, New York, NY, for Respondent.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Martin I. Spier renews his petition to enforce an arbitration award rendered in Italy by Italian arbitrators against respondent Calzaturificio Tecnica S.p.A ("Tecnica").

The verb "renew" reflects the fact that Spier has previously moved for that relief. In the circumstances then obtaining, and for the reasons stated in *Spier v. Calzaturificio Tecnica S.p.A.*, 663 F.Supp. 871 (S.D.N.Y.1987) (*"Spier I"*), familiarity with which is assumed, I deferred the enforcement proceedings until the ultimate outcome of Tecnica's then pending challenge to the validity of the award in the Italian courts. *Spier I*, 663 F.Supp. at 875. That ultimate outcome has now been achieved.

Specifically, the Italian court of first instance, the Treviso Tribunal, entered judgment nullifying the award in Spier's favor. The Court of Appeals of Venice affirmed that judgment, and was in turn affirmed by the Supreme Court of Cassation, Italy's highest court.

Nothing daunted, Spier renews his petition in this Court to enforce the award. He argues that this Court should confirm the award and enter judgment thereon, notwithstanding the decisions of the Italian courts. Predictably enough, Tecnica contends that the decisions of the Italian courts require that Spier's petition be denied.

## I. BACKGROUND

The underlying facts are stated in detail in *Spier I*. They are reiterated only to the extent necessary to explain the Court's decision in the present circumstances.

In 1969 Spier, an engineer resident in New York and an American citizen, entered into a contract with Tecnica, an Italian corporation, calling for Spier to furnish Tecnica with expertise for the manufacture by Tecnica in Italy of plastic footwear and ski boots, in exchange for the payment of certain fees by Tecnica. The contract was executed in Italy and the original is in the Italian language. Payments by Tecnica to Spier were to be made in Italian lire at the then prevailing official rate of exchange with the dollar.

The contract provided (in translation) that "[a]ny disputes that may arise between us concerning this agreement, shall be submitted to arbiters who will act as friendly conciliators and shall be decided by free and informal arbitration '*pro bono et aequo.*'" Spier says without contradiction that in the parlance of arbitration, this term "means that the arbitrators' decision was to be made based upon their notions of fairness and justice and without the strict application of law." Main Brief at 2 n. 3 (citations to text writers omitted). In the absence of any contrary interpretation suggested by Tecnica, I accept this meaning of the term *pro bono et aequo.*

The documents submitted by Spier on this renewed petition include translations into English of the Italian arbitrators'

award and the decision of the Treviso Tribunal nullifying the award. Spier does not furnish translations of the decisions of the two Italian appellate courts which reached the same conclusion, omissions which Tecnica remedies in its opposing papers.

*The Arbitration Award*

It appears from these documents that much of Spier's claims against Tecnica arose out of the production of plastic footwear by Tecnica after 1973. From that year forward, Tecnica employed a new footwear production system. Spier claimed that Tecnica derived that system from expertise conveyed by Spier to Tecnica pursuant to the parties' 1969 agreement, so that under that agreement Spier was entitled to compensation from Tecnica for the latter's 1973 and post–1973 footwear production. Tecnica claimed that its new production system owed nothing to Spier's input. The arbitrators retained a technical consultant to advise them on this issue, but then declined to follow their consultant's opinion, although the arbitrators stopped short of branding the opinion as wrong. So much appears from the arbitrators' award, Pet. Ex. 4 at 26, which states that

> ... the consultant's conclusion that starting from 1973, Tecnica apparently derived the new footwear production system not from Spier's know-how, but from the knowledge of the sole moulding that Tecnica possessed back in 1969, is not completely satisfactory ...

The arbitrators' dissatisfaction with the opinion of their own technical consultant led them to fashion a monetary award in Spier's favor that, had the arbitrators followed the consultant's advice, would have been quite different. The consultant's opinion would seemingly have entitled Spier to payments (described as "royalties") from 1969 through 1972, but not thereafter, given the consultant's view that the new footwear production system Tecnica installed in 1973 was not derived from Spier's expertise. However, the arbitrators concluded that "as an equitable settle-

ment, Tecnica is under the obligation to indemnify Spier for the termination caused by it, in addition to the royalties paid from 1969 to 1972." Pet. Ex. 4 at 29. As justification for their award to Spier, the arbitrators stated that

> this arbitration is not concerned with the payment of royalties forecast until the natural termination of the agreement, which probably would not be due in accordance with the Technical Consultant's opinion on the subject, but instead with reaching a settlement agreement with Spier which would close his relationship with Tecnica, and absorb any and all his claims including the payment of damages.

*Id.* at 30. To achieve that stated purpose, the arbitrators awarded Spier one billion Italian lire plus interest at the rate of 15% per year from January 1, 1985.

*The Decisions of the Italian Courts*

As noted, Tecnica challenged this award in the Italian courts. All three courts considering the case have held that the award could not stand. All three opinions reached the conclusion, although differently expressed, that whatever latitude in fashioning remedies an arbitration *pro bono et aequo* may confer upon arbitrators in general, these particular arbitrators' award to Spier exceeded their powers.

Thus the opinion of the Treviso Tribunal observed that the arbitrators' analyses "are not used by the arbitral panel to overcome the conclusions of the [technical consultant], but to justify, in light of their settlement intent, the overcoming of those very same conclusions, so as to allow the recognition of Tecnica's duty to 'compensate Mr. Spier for the non-prosecution of the business relationship with Tecnica, in addition to the royalties paid from 1969 to 1972.'" Pet. Ex. 6 at 17. Tecnica's obligations to Spier as fashioned by the arbitrators, the Treviso Tribunal noted, "are not found to originate either from the contractual obligation or from the duty to pay royalties ... but from an obligation com-

pletely outside the contractual relation between the parties." The Treviso Tribunal nullified the resulting award because "[i]t was not within the arbitrators' powers to determine the existence of, as well as the compensation for, a sort of long service bonus for Mr. Spier, [a] long service bonus completely unrelated to both the contractual obligations and the contractual relationship between the parties." *Id.* at 18–19.

The opinion of the Court of Appeals of Venice, Resp. Ex. B, affirmed the Treviso Tribunal's nullification of the award because the Court of Appeals agreed with the Tribunal that "the reported flaw of excess of authority exists." *Id.* at 16. In the Court of Appeals' analysis, the arbitrators, having perceived Spier's right to receive royalties after 1973 and up to 1984 "as being uncertain," then proceeded to calculate "a sum of money for a completely different right, i.e., as a kind of 'pay-off' from the relationship." *Id.* The resulting award could not stand, in the view of the Court of Appeals, because whatever powers of settlement or conciliation were given to the arbitrators, "the arbitrators would not in any case have been allowed to bring about an independent settlement of the interests between the parties by involving rights that were completely unrelated to the content of the arbitration agreement and, therefore, of the subject of the dispute." *Id.* at 17.

On a further appeal by Spier to Italy's highest court, the Supreme Court of Cassation affirmed the lower courts' nullification of the arbitrators' award. The opinion of the Supreme Court of Cassation, Resp. Ex. C at 7–8, makes it clear that that Court approved the reasoning and the conclusions of both the Treviso Tribunal and the Court of Appeals of Venice:

> It is not possible to set aside the "ratio decidendi" which led the trial judges to recognize the elements of what can ... be classified as an excess of authority in the decisions with which ... the arbitral panel extended the "quantum" of the

compensation to a much greater extent, including therein a kind of fee, in favor of Spier, for the use by the Italian company of the acquired technology also in the period which followed termination of the relationship, said termination not having been stated by the arbitrators, nor suggested by Spier, as being in any way illegal.... While the arbitrators' sensitivity for an aspect of undoubted financial relevance in the relationship between the parties must be acknowledged, the decree by the appeal judges appears to be legally correct since they denied that this phenomenon was related to the framework of the mandate entrusted to the arbitrators by Spier, involving his right to receive a contractual fee in the form of royalties for a continuing relationship and his claim for compensation for damages for the breach of contract attributed to the other party.

While the intricacies of the Italian courts' reasoning may be partially lost in translation, it seems entirely clear that all three courts nullified the award because they concluded that the arbitrators, casting off all restraints imposed by the contract between Spier and Tecnica, conferred upon Spier a "bonus" or a "pay-off" in a manner and an amount that exceeded the exceeded the arbitrators' powers. In these seemingly inauspicious circumstances, Spier renews his petition to this Court to enforce the Italian arbitration award.

## II.  DISCUSSION

Spier's petition to enforce the Italian arbitrators' award falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, TIAS 6997 (1970) (the "Convention"), implemented by 9 U.S.C. §§ 201–208. *See Spier I,* 663 F.Supp. at 872, 873.

At the time of Spier's initial petition in 1987, Tecnica had filed its action in the Treviso Tribunal challenging the award; Spier had not yet appeared in the action,

although thereafter he participated fully in the proceedings before the three Italian courts. Tecnica defended against Spier's petition in this Court, and cross-petitioned to deny enforcement of the award, by invoking Articles V and VI of the Convention, quoted in pertinent part in *Spier I,* 663 F.Supp. at 873. To summarize, Article V provides that "[r]ecognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party" proves to the authority where enforcement is sought (here, this Court) that, *inter alia,* the underlying contract was not valid under the law of the country where the award was made (here, Italy), Art. V(1)(a); or the arbitral award contained decisions on matters beyond the scope of the submission to arbitration, Art. V(1)(c); or governing law provides that the award is not binding on the parties, Art. V(1)(e).[1]

Tecnica relied upon all three of these Article V provisions in opposing Spier's initial petition in this Court. As to the third ground, the parties entered into an extended discussion, supported by irreconcilably differing affidavits submitted by equally eminent Italian attorneys, as to whether Spier and Tecnica had agreed to an "arbitrato rituale" or an "arbitrato irrituale," the latter creature being (in Tecnica's submission) not enforceable under the Convention. *See Spier I,* 663 F.Supp. at 873–874.

In view of the then pending Italian court proceedings, this Court in *Spier I* stayed decision on the parties' cross-petitions until the Italian courts had decided the case, a procedural option extended to the authority where enforcement is sought by Article VI of the Convention. 663 F.Supp. at 873.

Before the Treviso Tribunal, Tecnica challenged the validity of its underlying contract with Spier on the ground that it violated an Italian currency exchange statute (this also being a ground Tecnica argued in this Court for refusing to enforce the award under Article V(1)(a) of the Convention). Tecnica also argued that the award exceeded the arbitrators' powers, the ground specified in Article V(1)(c). Although Italy adheres to the Convention, and as noted Tecnica has urged these Article V grounds against enforcement of the award in the United States, Tecnica's challenge to the award before the Treviso Tribunal did not fall under the Convention, but was based upon Italian domestic law, which the Italian courts were competent to apply in evaluating the validity of the award. I concluded that those questions should first be considered by the Italian courts.[2]

In the event, the Treviso Tribunal rejected Tecnica's contention that the underlying contract violated Italian currency laws, a ruling undisturbed on appeal, and demonstrated no particular interest in the distinction between an "arbitrato rituale" and an "arbitrato irrituale." As noted in Part 1 of this opinion, the Treviso Tribunal nullified the arbitration award because it concluded that the arbitrators had exceed-

---

1. As more fully stated *infra,* Article V(1)(e) also provides, as a ground for refusing to enforce an award, proof that the award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." In view of the decisions of the Italian courts, all post-*Spier I,* that Convention provision now lies at the heart of the case.

2. Accordingly I wrote in *Spier I* at 663 F.Supp. at 875:

    In the case at bar, I do not conceive the Italian courts to be presented with the question of whether this "arbitrato irrituale" falls within and is enforceable under the Convention. That question, although it arises here, would not seem to arise in Italy, since the award was rendered in Italy and is challenged in the Italian courts. But clearly the Italian courts must consider under Italian law the nature of the award, and the permissible scope of the challenges Tecnica may assert against it, including the alleged invalidity of the entire contract.

    In those circumstances, I invoked Article VI of the Convention to stay proceedings here in this Court.

ed their powers, a judgment affirmed by the two Italian appellate courts.

That circumstance enables Tecnica to oppose Spier's renewed petition on the alternative ground specified in Article V(1)(e) of the Convention, namely, that the award "has been set aside or suspended by a competent authority of the country in which, or under the law, of which, that award was made."

Subsequent to this Court's opinion in *Spier I,* the Second Circuit has decided two arbitration award enforcement cases under the Convention: *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys. "R" Us,* 126 F.3d 15 (2d Cir.1997) ("*Yusuf*"), and *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.,* 1999 WL 781594 (2d.Cir. Oct. 1, 1999) ("*Baker Marine*").[3] These decisions control the case at bar, and require that Spier's renewed petition be denied.

In *Yusuf,* an American company and its Hong Kong affiliate entered into a contract with a Kuwaiti company for the licensing and sale of toys. The contract provided for arbitration of disputes in New York under the auspices of the American Arbitration Association. The Kuwaiti company, Alghanim, received a substantial award and petitioned under the Convention to enforce the award in this Court. The American company, Toys "R" Us, cross-petitioned under the domestic Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("the FAA") to vacate the award.

The Second Circuit first held that Alghanim's petition to confirm the award properly fell under the Convention, which applies *inter alia* to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." 126 F.3d at 18, quoting Article I(1) of the Convention. Since Alghanim sought enforcement of its award in the United States, the threshold question was whether the award would be considered a nondomestic award in this country. While

noting that "[t]he Convention does not define nondomestic awards," 126 F.3d at 19, citing *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 932 (2d Cir.1983), the court of appeals had no difficulty applying that characterization to the award in *Yusuf:* "The dispute giving rise to this appeal involved two nondomestic parties and one United States corporation, and principally involved conduct and contract performance in the Middle East. Thus, we consider the arbitral award leading to this action a nondomestic award and thus within the scope of the Convention." *Id.*

If the applicability of the Convention in this Court to the arbitral award at bar depended upon the provision in Article I(1) quoted *supra,* that award would also be characterized as nondomestic, arising as it does out of an American citizen's contract with an Italian company calling for implementation, performance and payment in Italy.

However, the Convention's application to the award at bar does not depend upon that provision, but rather upon the first sentence of Article I(1), which provides:

> This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal.

This provision governs the case at bar because the award was made in "the territory of a State" (Italy) "other than the State where the recognition and enforcement" of the award is sought (the United States).

Notwithstanding that distinction, *Yusuf* is instructive in the case at bar because of what the Second Circuit says about the available grounds for resisting enforce-

---

3. The Second Circuit decided *Baker Marine* after the parties' briefs on Spier's renewed petition had been filed and the case was *sub judice.* The parties discuss *Baker Marine* in supplementary letter briefs.

ment of an award when enforcement is sought in a United States district court.

In *Yusuf*, the arbitration was held and the award issued in the United States, and enforcement was sought in the United States. Those circumstances, the Second Circuit held, were sufficient to entitle Toys "R" Us, the party against whom the award was made, to invoke the FAA's implied grounds for refusing to enforce to the award, in addition to the limited statutory grounds found in the FAA for vacating an award, *see* 9 U.S.C. § 10, or modifying it, *see id.* § 11. The implied grounds for *vacatur* recognized by the FAA are found "where the arbitrator's award is in manifest disregard of the terms of the agreement, or where the award is in manifest disregard of the law." *Yusuf*, 126 F.3d at 23 (citations and internal quotation marks omitted). And in those particular circumstances, the principles of domestic American law for *refusing to enforce* an award apply, notwithstanding the fact that a petition to *enforce* the award falls under the Convention.

However, where (as in the case at bar) an arbitral award is made in one State adhering to the Convention and sought to be enforced in another adhering State, the grounds for resisting the award are limited to those found in Article V of the Convention. In *Yusuf* the Second Circuit explains the difference:

> In sum, we conclude that the Convention mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought. The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief.

See Convention art. V(1)(e). However, the Convention is equally clear that when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.

126 F.3d at 23.[4]

The Second Circuit's more recent decision in *Baker Marine* illustrates the "very different regime[ ] for the review of arbitral awards" when the award is rendered in one State and sought to be enforced in another. Nigerian and American companies entered into two contracts to provide barges for use in servicing Nigeria's oil industry. The contracts provided for arbitration in Nigeria. Two panels of arbitrators made monetary awards in favor of Baker Marine. Baker Marine sought enforcement of both awards in the Nigerian Federal High Court. The losing parties appealed to the same court to vacate the awards. In that effort they succeeded; the Nigerian court set aside both arbitration awards.

Invoking the Convention, Baker Marine then petitioned the Northern District of New York to enforce the awards. Judge McAvoy denied those petitions, reasoning that "under the Convention and principles of comity, it would not be proper to enforce a foreign arbitral award when such an award has been set aside by the Nigerian courts." 1999 WL 781594 at 2 (internal quotation marks omitted). The Second Circuit affirmed. It cited *Yusef* for the proposition that where enforcement of an arbitral award is sought in a State other than that where the award was made, "Article V [of the Convention] provides exclusive grounds for setting aside" the award. 1999 WL 781594 at 2. The Nigerian court having set aside the Nigerian arbitration awards, Article V(1)(e) furnished the ground for a United States district court to

---

**4.** The arbitral losing party in *Yusuf*, which contended for and obtained the application of American law in resisting the award, achieved a Pyrrhic victory. The court of appeals held that the FAA furnished no grounds for vacating the award. 126 F.3d at 23–25.

refuse to enforce them. The court of appeals said:

> Article V(1)(e) provides that a court may refuse enforcement of an award that "has been set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made." Convention, art. V(1)(e). Baker Marine does not contest that the Nigerian High Court is a competent authority in the country in which, and under the law of which, the award was made. The district court relied on the decision of the Nigerian court and Article V(1)(e) in declining to enforce the award.

*Id.*

In an effort to preserve the awards, Baker Marine made a number of arguments which the Second Circuit rejected. It is instructive to consider the court of appeals' rejections of those arguments, since Spier also makes them in the case at bar.

First, Baker Marine argued that the Nigerian court set aside the awards for reasons that would not be recognized under domestic United States law as valid grounds for vacating the awards. In aid of that contention, Baker Marine criticized the district court for disregarding Article VII(1) of the Convention, which provides that the Convention shall not "deprive any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon." That language, Baker Marine contended, served to incorporate into the Convention the domestic law of the United States as grounds for resuscitating Nigerian awards nullified by a Nigerian court.

The Second Circuit rejected the argument. It reasoned that "the parties contracted in Nigeria that their disputes would be arbitrated under the laws of Nigeria." Moreover, "[t]he governing agreements make no reference whatever to United States law," and "[n]othing suggests that the parties intended United States domestic arbitral law to govern their disputes." 1999 WL 781594 at 2. Indeed, the intrusion of United States law on the scene would frustrate that law's public policy, since "[t]he primary purpose of the FAA in ensuring that private agreements to arbitrate are enforced according to their terms." *Id.* (citations and internal quotation marks omitted). Nor did Baker Marine contend "that the Nigerian courts acted contrary to Nigerian law." *Id.* at 3. The Second Circuit's opinion in *Baker Marine* reminds the reader of its prior holding in *Yusuf* that domestic arbitral law may be applied only by "a court under whose law the arbitration was conducted," *id.* at 3, citing and quoting *Yusuf,* 126 F.3d at 21. Lastly, the *Baker Marine* court cites approvingly at 1999 WL 781594 3 n. 2 a commentator's observation that "mechanical application of domestic arbitral law to foreign awards under the Convention would seriously undermine finality and regularly produce conflicting judgments," the foreseeable consequence of such application being that "a losing party will have every reason to pursue its adversary 'with enforcement actions from country to country until a court is found, if any, which grants the enforcement.'" (citing and quoting Albert Jan van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 355 (1981)).[5]

Second, Baker Marine argued that because Article V(1) of the Convention begins with the permissive phrase that "[r]ecognition and enforcement of an award *may* be refused" if one of the subsequently enumerated grounds for doing so is proved (emphasis added), rather than a mandatory term, the district court "might

5. The Convention discussed in text is sometimes referred to as "the New York Convention" to reflect the place where it was drafted.

have enforced the awards, notwithstanding the Nigerian judgments vacating them." 1999 WL 781594 at 3. Rejecting that contention, the Second Circuit's pointed response was that "Baker Marine has shown no adequate reason for refusing to recognize the judgments of the Nigerian court." *Id.*

It is also instructive to note that at that point in the *Baker Marine* text, the Second Circuit dropped footnote 3, which distinguishes a case upon which Spier places primary reliance: *In re Chromalloy Aeroservices*, 939 F.Supp. 907 (D.D.C.1996). In *Chromalloy,* an American company bearing that name entered into a military procurement contract with the Egyptian Air Force (hereinafter "Egypt"). The contract required arbitration of all disputes, recited that "both parties have irrevocably agreed to apply Egypt [sic] Laws and to choose Cairo as seat of the court of arbitration," and further provided that "[t]he decision of the said court shall be final and binding and cannot be made subject to any appeal or other recourse." 939 F.Supp. at 912. Disputes having arisen, the arbitrators issued an award which Chromalloy petitioned the District Court for the District of Columbia to enforce. Egypt responded by seeking and obtaining from the Egyptian Court of Appeal a judgment nullifying the award, which Egypt then pleaded in bar to Chromalloy's petition in the district court to enforce the award.

In these particular circumstances, the district court held that Chromalloy could invoke Article VII of the Convention in order to take advantage of the FAA, and enforced the award. The court regarded as central to its decision the fact that Egypt, by appealing the arbitration award to the Egyptian court, "seeks to repudiate its solemn promise to abide by the results of the arbitration," in breach of the contractual agreement that "the arbitration ends with the decision of the arbitral panel." 939 F.Supp. at 912. Because the FAA and its amendment to implement the Convention "demonstrate that there is an emphatic federal policy in favor of arbitral dispute resolution, particularly in the field of international commerce, [a] decision by this Court to recognize the decision of the Egyptian court would violate this clear U.S. public policy." *Id.* at 913 (citations and internal quotation marks omitted).

On the facts presented in *Baker Marine,* the Second Circuit distinguished *Chromalloy,* writing in footnote 3:

> The district court [in *Chromalloy* ] concluded that Egypt was "seeking to repudiate its solemn promise to abide by the results of the arbitration," and that recognizing the Egyptian judgment would be contrary to the United States policy favoring arbitration. See *id.* at 912, 913. Unlike the petitioner in *Chromalloy,* Baker Marine is not a United States citizen, and it did not initially seek confirmation of the award in the United States. Furthermore, Chevron and Danos did not violate any promise in appealing the arbitration award with Nigeria. Recognition of the Nigerian judgment in this case does not conflict with United States public policy.

In some respects *Chromalloy* bears a superficial resemblance to the case at bar, since Spier is a United States citizen and seeks confirmation of the award in the United States. But I read this footnote in *Baker Marine* to identify as the decisive circumstance Egypt's repudiation of its contractual promise not to appeal an arbitral award. Only that circumstance is singled out as violating American public policy articulated in the FAA, thereby justifying the district court's enforcement of the Egyptian award.

In the light of these recent Second Circuit cases, I consider Spier's several arguments in favor of enforcement by this Court of the award against Tecnica.

First, Spier argues that "[t]he threshold issue ... is whether or not the award would be set aside under American law," Reply Brief at 2, and collects American

cases to support the proposition that it should be, Main Brief at 9–13. But the Second Circuit's holdings in *Yusuf* and *Baker Marine* preclude this Court from reaching that threshold, let alone crossing it. Spier seeks to apply domestic United States arbitral law in order to escape the Italian courts' nullification of an Italian award. That effort cannot survive the court of appeals' observation in *Yusuf* that under the Convention "the state in which, or under the laws of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." 126 F.3d at 23. The award at bar was set aside by that state's highest tribunal, the Supreme Court of Cassation of Italy; no American court or statute may be cited to the contrary. In other words, Spier cannot be heard to argue that the Italian courts' decisions should not be recognized on the ground that an American court would reach a different result with respect to the award if it had been rendered in the United States.

Nor may Spier introduce domestic United States law, statutory or decisional, into the case at bar through the vehicle of Article VII of the Convention. *Baker Marine* precludes that effort. There is no basis for applying American law to the rights and obligations of the parties, including dispute resolution by arbitration. Just as did the parties in *Baker Marine*, Spier and Tecnica contracted in a foreign state that their disputes would be arbitrated in that foreign state; the governing agreements make no reference to United States law; and nothing suggests that the parties intended United States domestic arbitral law to govern their disputes.

Spier's reference to the permissive "may" in Article V(1) of the Convention does not assist him since, as in *Baker Marine*, Speir has shown no adequate reason for refusing to recognize the judgments of the Italian courts.

Finally, the *Chromalloy* district court's reliance upon the FAA to disregard an Egyptian court's decision nullifying an Egyptian award was prompted by a particular circumstance not present in the case at bar: Egypt's blatant disregard of its contractual promise not to appeal an award. Spier points to no comparable provision in his contract with Tecnica; and, while Spier deplores the Italian courts' decisions, he does not suggest that Italian domestic law, made applicable to this Italian award by the Convention as construed by the Second Circuit in *Yusuf*, did not entitle Tecnica to challenge the award in the Italian courts.

It remains only to say that even if, contrary to my conclusions previously stated, Spier is entitled to test this award by the measures of domestic United States law, it avails him nothing. That is because all three Italian courts nullified the award on the ground that in making it the arbitrators had exceeded their powers, a ground for vacatur under the FAA. *See* 9 U.S.C. § 10(a)(4).[6]

For the foregoing reasons, Spier's renewed petition to enforce the arbitral

---

6. In his Reply Brief Spier makes the alternative argument that even under the Italian courts' decisions, certain sums awarded by the arbitrators to him survive, and "[i]t would take little effort for this Court to extract from the arbitrators' decision amounts which are clearly due" to Spier. Reply Brief at 7. Whether that exercise would be easy or onerous, I decline to undertake it. As a practical matter, the exercise would involve amending or modifying the arbitrators' award or the judgments of three Italian courts or all of the above. Those functions lie well beyond the limited subject matter jurisdiction conferred upon this Court by the Convention and its implementing domestic legislation which, in respect of an arbitral award rendered in a foreign contracting State, empower me to do enter one of only two judgments: enforcing the award, or refusing to do so upon proof of one of the grounds specified in Article V(1) of the Convention.

award is denied.[7]

It is SO ORDERED.

7. While this opinion was in the final stages of preparation, counsel for Spier sent the Court a letter dated October 14, 1999 (received in Chambers on October 18). That letter stated that "there have been recent decisions, articles, and reports of meetings covering the subject matter in the motion" which necessitated oral argument or, in the alternative, additional briefs "covering the new develop-ments." No particulars are given with respect to the character or identity of these new developments. For the reasons stated in text, I conclude that recent and governing Second Circuit caselaw mandates denial of the petition, see no need for oral argument, and am filing this opinion. Petitioner may move for reconsideration or reargument if so advised.