Ronald A. NIMKOFF, et al., Plaintiffs,

v.

**TANNER PROPP & FARBER,**
et al., Defendants.

**No. 96 CIV 0026 JES.**

United States District Court,
S.D. New York.

April 26, 2001.

Schechter & Nimkoff, LLP (Ronald A. Nimkoff, of counsel), New York City, for Plaintiff.

Tanner Propp, LLP (Lester J. Tanner, of counsel), New York City, for Defendants Tanner Propp & Farber, Lester J. Tanner, Norman Rosenberg, Morris Simkin, Mitchell Lapidus, Deborah Gunset, Robert Zito, David Lubell, Marilyn Haft, Theodore Propp, Anne–Renee Testa and Northwest Management Corp.

Parker Duryee Rosoff & Haft (Robert J. Miller, of counsel), New York City, for Defendant Allan Samuels.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Ronald A. Nimkoff ("plaintiff") brings the above-captioned action alleging numerous causes of action arising from his employment and termination from the law firm of Tanner Propp & Farber ("the Law Firm," "the Firm" or "the Partnership"). Defendants, former partners of the Law Firm,[1] have moved for confirmation of the Clarified Arbitration Award ("the Clarified Award") rendered with respect to this action, and plaintiff has cross-moved to vacate and/or modify the Clarified Award. For the reasons that follow, defendants' motion is granted and plaintiff's motion is denied.

## BACKGROUND

Plaintiff brings twenty-seven causes of action, eleven which this Court deemed arbitrable in accordance with the terms of the Law Firm's Partnership Agreement.[2]

---

1. Defendants in this action include both former partners of the Law Firm and various individuals and entities having done business with the Law Firm. *See* First Amended Complaint dated July 22, 1996 ("Complaint") at ¶¶ 6–24. For the purposes of this Memorandum Opinion and Order, however, the term "defendants" shall apply only to plaintiff's former partners, as the arbitration proceeding at issue dealt only with claims against these individuals. *See* Affidavit of Ronald A. Nimkoff dated July 27, 2000, Exhibit ("Exh.") D, Articles of Partnership dated as of January 1, 1994 ("Partnership Agreement") at ¶ 18.

2. Such claims included Counts I–III, each alleging a RICO conspiracy among the Law Firm partners pursuant to 18 U.S.C. §§ 1962, 1964(c); Count IV for fraudulent misrepresentation in connection with plaintiff's engagement as a Law Firm partner; Counts V and VI requesting payments due to plaintiff following an accounting; Counts XV and XVI regarding plaintiff's provision of services to client Shirley Neufeld; Count XVII for negligent management of the Law Firm; Count XVIII for wrongful termination of plaintiff and dissolution of the Law Firm; and Count XIX for the causation of extreme emotional distress to plaintiff. *See* Order dated November 4, 1996; Complaint at ¶¶ 95–128; 162–86. Further, with respect to Count XIV, which alleged that defendant Lester J. Tanner ("Tanner") personally guaranteed sums to partners Marilyn Haft ("Haft") and Morris Simkin ("Simkin") but used Partnership monies to fulfill such guarantees, the Court ordered that the arbitrator was to make findings as to the Partnership earnings due to these partners, which the Court would in turn use to adjudicate this Count. *See* Order dated November 4, 1996; Complaint at ¶¶ 158–61.

*See* Order dated November 4, 1996; Partnership Agreement at ¶ 18. The following facts are relevant to plaintiff's objections to the Clarified Award which granted plaintiff an award of $19,642 and dismissed all other arbitrable claims.

*Factual Background*

The Law Firm was the successor to a previous firm created under the same name on January 1, 1993 ("the 1993 Law Firm"). *See* Defendant's Submission of Testimony and Evidence that Supports Confirmation of Award dated January 2, 2001 ("Def.Add.Subm.") at ¶ 4. Due to the departure of several associates and partners, the remaining partners of the 1993 Law Firm decided to engage six new partners as of January 1, 1994, including plaintiff and several defendants to this action. *See id.* at ¶¶ 4–5. Accordingly, during the latter part of 1993, these individuals engaged in discussions and negotiations regarding the proposed Partnership Agreement, which was subsequently signed by all partners of the Law Firm. *See id.* at ¶¶ 5–6.

The Partnership Agreement contained a formula for assessing each partners' annual share of proceeds that was based on client generation, billing time and firm profit or loss. Specifically, each partner was entitled to a basic entitlement that was equal to the sum of (i) one-third of the fees collected by the Law Firm attributable to that partner's time charges plus (ii) one-sixth of the fees collected by the Law Firm on client matters originated by that partner irrespective of the number of hours devoted to the matters by the partner ("the Basic Entitlement"). *See* Partnership Agreement at ¶¶ 4–5. The Basic Entitlement was then deducted from the

Law Firm's gross income along with all other expenses to determine net profit or loss for each calendar year. *See* Partnership Agreement at ¶ 5 ("[T]he net profits or net losses of the Partnership shall be equal, on a cash basis, to the difference between (i) the fee income received during the fiscal year, plus other non-fee income ... earned, during such year, and (ii) the sum of the [Basic Entitlement] for such year plus all expenses.").

Thereafter the Law Firm's net profit or loss was apportioned to each partner based upon a computation of shares made in an addendum to the Partnership Agreement. *See* Partnership Agreement, BPS Addendum at 5. According to plaintiff, in 1994 he was apportioned a 4.23 percent share of profit or loss, while defendants claim that plaintiff was actually apportioned a 4.29 percent share. *See* Affidavit of Lester J. Tanner dated June 22, 2000 ("Tanner Aff.") at ¶ 12. Plaintiff and defendants each agree, however, that in 1994 the Law Firm experienced major net losses, with plaintiff arguing that this loss was equal to $444,084 and defendants claiming this loss was $499,625. *See id.* The parties also agree that the Law Firm generated approximately $900,000 in revenue between 1995 through 1997 for work performed by lawyers in 1994, and that plaintiff did not receive nor was credited with any part of such revenue. *See* Nimkoff Aff. at ¶¶ 47–49.

During the course of the arbitration, plaintiff and defendants reached a stipulation as to the amount of plaintiff's Basic Entitlement for 1994, without taking into account plaintiff's entitlement to sums for work on two client matters, the Neufeld matter and the Delphi Matter.[3] As put

---

**3.** The Neufeld matter involved claims by Nimkoff that he was entitled to $9,044 for work billed to this matter that was not paid for by the client. Plaintiff alleged that the Neufeld

originating partner breached a fiduciary duty owed to him by failing to inform him that it was unlikely the client would pay for the time he was devoting to the matter. *See* Tanner

forward on the record of the arbitration by the arbitrator:

> it is stipulated that as a[B]asic [E]ntitlement, i.e., the one-third/one-sixth formula to Mr. Nimkoff, that the amount of entitlement is $134,642 and that really the only client matters that I have to decide vis-a-vis that one-third/one-sixth formula are Neufeld and Delphi. There are many issues I have to decide including allocations of profit and loss, including all sorts of other claims of breach of fiduciary duty and so on.

Nimkoff Aff. at ¶ 48. As plaintiff had previously stipulated that the Law Firm had already made him payments of $115,000 during 1994, this left him a net Basic Entitlement of $19,632, subject to the Neufeld and Delphi matters and a deduction for his share of the 1994 Partnership loss. *See* Tanner Aff. at ¶ 14.

Also relevant to this dispute are provisions of the Partnership Agreement relating to the withdrawal and termination of partners and the termination of the Partnership. Specifically, the Partnership Agreement provided in part that "[a]ny partner shall have the right to withdraw from the Partnership as of the close of any month or of any fiscal year upon at least three (3) months prior written notice." Partnership Agreement at ¶ 8(a). Such withdrawal would

> not terminate the Partnership and shall have no effect upon the continuance of the Partnership and its operations and the remaining partners shall continue to share in the profits and losses of the Partnership ... except that the [total shares of the partners] shall be reduced by the number theretofore applicable to the withdrawing partner.

Aff. at ¶ 17. The Delphi matter involved claims that plaintiff was entitled to $8,000 that the Law Firm allegedly wrote off as not

*Id.* As for a withdrawing partner, that individual was

> entitled to receive the amounts credited to his share of the capital account of the Partnership as of the effective date of his withdrawal based upon a cash basis Balance Sheet of the Partnership as of said date ... which shall reflect the net profits or net losses of the Partnership from the beginning of its current fiscal year through said date.

*Id.* at ¶ 8(b).

In situations of "Compulsory Withdrawal," the Partnership Agreement provided further that:

> [i]n the event that any partner ... violate[s] any material provision of [the Partnership Agreement] or [engages in] misconduct or willful inattention to the professional affairs of the Partnership ... or actions deemed by the other partners to be materially adverse to the interests of the Partnership as a whole, then the other partners by a vote of at least 66-2/3% in interest of [shares held by partners], (excluding the partner affected by said vote ... ) evidenced by an instrument in writing, shall have the right to remove such partner upon at least thirty (30) days prior written notice.

*Id.* at ¶ 13. Moreover, "[i]f any such notice of removal [was] given to a partner, he [was] deemed to have withdrawn from the Partnership on the date fixed in such notice with the same effect as if he had voluntarily withdrawn." *Id.*

Finally, with respect to the termination of the Partnership, the Partnership Agreement provided that:

> [t]he Partnership may be terminated at any time as of the end of any calendar

billable to the client when an unfavorable result had been obtained for the client. *See id.* at ¶ 15.

month or fiscal year by the affirmative vote of partners having an aggregate interest of at least 66–2/3% of the first level of net profits .... evidenced by a written agreement signed by such partners and served on the other partners at least six (6) months before the effective date of such termination.

*Id.* at ¶ 9(a). It further provided that "[t]he Partnership shall be deemed to have continued under this agreement if partners holding a majority in interest ... join together to form a new partnership ... within one (1) year from the effective date of the termination of this firm." *Id.* at ¶ 14(b).

At least nine of the Law Firm Partners representing 66–2/3% of shares entered into a Written Instrument of Termination as of January 11, 1995 ("the Termination Instrument"), which required "the termination of the Partnership as of July 31, 1995 in accordance with the provisions of the Partnership Agreement." Def. Add. Subm., Appendix B–5, Arbitration Exh. C–41, Termination Instrument at 1; Transcript of Arbitration Proceedings ("Arb.Tr.") at 2419–21, 1327. It is further undisputed that six of the former partners of the Law Firm entered into a Modified and Supplemental Articles of Partnership on January 1, 1995 ("the Modified Partnership Agreement"). *See* Nimkoff Aff., Exh. K. Arbitration Appendix, Exh. C–42, Modified and Supplemental Articles of Partnership dated January 1, 1995.

*The Arbitrators' Decision and Procedural History*

Following twenty-two days of hearings, the arbitrator issued his Initial Award on May 4, 1998 ("the Initial Award"), awarding plaintiff $19,642 and otherwise denying in entirety many of plaintiff's claims brought both in this action and in the arbitration proceeding. *See* Nimkoff Aff., Exh N. Award of Arbitrator dated May 4, 1998 ("Initial Award") at 1–2. Upon hearing Oral Argument on defendant's motion to confirm the Initial Award, this Court expressed its concern that the arbitrator had exceeded the scope of his authority in issuing the Initial Award and accordingly denied the motion to confirm pending modification or further clarification. *See* Nimkoff Aff., Exh. P. Transcript of Oral Argument dated January 15, 1998 at 34–36; Order dated March 17, 1997.

The parties thereafter made additional submissions to the arbitrator who issued his Clarified Award on April 6, 2000. *See* Tanner Aff., Exh. 1, Clarified Award at 1. In the Clarified Award, the arbitrator again awarded plaintiff $19,642 "based upon the accounting and other evidence that was presented by the parties at the arbitration." *Id.* at ¶ 1. In making such award, the arbitrator noted that

> I have not made individual allocations of other partners' entitlements since I have been advised that all other partners have stipulated that I should not do so. However, I have considered the aggregate monies owing to the other partners in determining the amount of the Award to [Plaintiff].

*Id.* The arbitrator additionally ruled that the claims set forth in Counts I–VI and XV–XIX of plaintiff's Amended Complaint were denied in their entirety and further that "[counter]claims asserted by [defendants] against [plaintiff] which arise out of the arbitration agreement as determined by [this Court's Order] are denied in their entirety." [4] *Id.* at ¶¶ 2–3.

---

4. The parties have stipulated at Oral Argument on the instant motions to dismissal of defendants' counterclaims I–IV regarding sums allegedly owed by plaintiff to the Law Firm and plaintiff's alleged intentional and negligent misrepresentations regarding his

Defendants thereafter made the instant motion to confirm the Clarified Award and plaintiff cross-moved to vacate and/or modify the Clarified Award. Upon hearing Oral Argument on these motions, the Court ordered that the parties each submit 100 pages of testimony from the arbitration proceeding which supported their respective claims regarding the arbitrator's consideration of whether plaintiff was entitled to profit received after 1994 for work performed in 1994. *See* Order dated November 2, 2000. The parties have each submitted materials in accordance with this Order, and in addressing the instant motion and cross-motion, the Court has reviewed these materials and all other materials submitted to the Court in connection with the instant motions. *See* Letter from Plaintiff dated January 2, 2001 ("Pl. Add.Subm."); Def. Add. Subm.; Letter from Counsel to Defendant Allan Samuels dated January 2, 2001 ("Samuels Add. Subm.").

### DISCUSSION

■ As noted by the Second Circuit, "[t]he showing required to avoid summary confirmation of an arbitration award is high, and a party moving to vacate the award has the burden of proof." *Willemijn Houdstermaatschappij v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997) (internal citations omitted). In addition to statutory grounds not relevant here,[5] a district court may vacate an arbitration award in the limited circumstances where it is in "manifest disregard" of the law or the terms of an agreement. *See id.*, 103 F.3d at 12; *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir.1997).

■ Such manifest disregard is only apparent where "the error made by the arbitrator[ ] is so obvious that it would be instantly perceived by the average person qualified to serve as an arbitrator." *Standard Microsystems*, 103 F.3d at 13. In applying this standard, a Court is reminded that an arbitrator's decision "is entitled to substantial deference, and the arbitrator need only explicate his reasoning under the contract in terms that offer even a barely colorable justification for the outcome reached in order to withstand judicial scrutiny." *Alghanim*, 126 F.3d at 23 (internal quotations omitted). Indeed, an arbitrator need not provide an explanation for their decision, and a Court is to "confirm the arbitrator's decision if a ground for the arbitrator's decision can be inferred from the facts of the case." *Standard Microsystems*, 103 F.3d at 12.

Plaintiff claims here that the arbitrator manifestly disregarded the Partnership Agreement in (1) ruling that plaintiff was entitled only to his Basic Entitlement for 1994 and not any profits in subsequent years generated from work performed in 1994; (2) ruling that the remaining Law Firm partners had properly terminated the Partnership; and (3) failing to perform an accounting of sums due to him and all

---

client base upon entering the Law Firm. *See* Transcript of Oral Argument dated October 25, 2000 ("Arg.Trans.") at 60–63. Defendant's remaining counterclaims regarding malicious prosecution in bringing the instant action do not arise out of the Partnership Agreement and accordingly are not addressed in this ruling. *See id.*

**5.** While 9 U.S.C. § 10(a)(4) provides for vacating an arbitration award when "there was

evident partiality or corruption in the arbitrators," the Court finds plaintiff's vague and wholly unsubstantiated allegations regarding the arbitrator's partiality to be without merit. *See* Tanner Aff. at ¶¶ 124–25. This is particularly the case here because, as discussed *infra*, the Court finds the arbitrator's decision to be eminently reasonable under the terms of the Partnership Agreement.

partners between 1994–1997. This Court finds, however, that each of plaintiff's grounds for vacating the Clarified Award is easily dismissed under the deferential standard of review discussed above.

■ Initially, with respect to sums received by the Partnership in 1994 (other than the Neufeld and Delphi Matters),[6] plaintiff stipulated that he was only entitled to $19,642, the sum he was ultimately awarded by the arbitrator. *See* Tanner Aff. at ¶ 14. Further, while plaintiff claims he is entitled to money received by the Partnership after 1994 for work performed in 1994, the arbitrator was well within his discretion to rule that plaintiff had no entitlement to this money because he constructively withdrew or was terminated from the Partnership at the end of 1994. While the Partnership Agreement admittedly called for notice to be given in cases of voluntary or involuntary withdrawal, the arbitrator was presented with ample testimony demonstrating that plaintiff failed to attend work or perform any Law Firm duties after 1994, and that at all times the Firm's major shareholders possessed a sufficient interest to force plaintiff's withdrawal. *See* Arb. Tr. at 541, 551–55, 559–60, 562–66, 1050, 1085–88, 1327–28, 1802–03, 2401, 2444, 2742–43, 2792, 3409, 4177–81, 4242–45.

Moreover, upon finding constructive withdrawal or termination, the arbitrator reasonably concluded both through examination of the Partnership Agreement and in hearing relevant testimony that the Partnership Agreement called for yearly disbursement of proceeds on a cash rather than accrual basis. *See* Partnership Agreement at ¶ 5 ("[T]he net profits or net losses of the Partnership shall be equal, *on a cash basis*, to the difference between (i) the fee income *received during the fiscal year*, plus other non-fee income ... *earned, during such year*, and (ii) the sum of the partners' [Basic Entitlement] *for such year* plus all expenses.") (emphasis added); *see also id.* at ¶ 8(b) ("[T]he withdrawn partner shall be entitled to receive the amounts credited to his share of the capital account of the Partnership *as of the effective date of his withdrawal based upon a cash basis Balance Sheet of the Partnership as of said date* ... which shall reflect the net profits or net losses of the Partnership *from the beginning of its current fiscal year through said date*") (emphasis added); Arb. Tr. at 2680–87, 2690–96, 4182–89. As such, plaintiff's withdrawal at the end of 1994 entitled him only to his share of proceeds from that fiscal year, and the arbitrator fairly found that any pending receivables would remain with the Law Firm.[7]

---

6. Plaintiff does not argue in his moving papers that the arbitrator's decision with respect to the Neufeld and Delphi matters were in manifest disregard of the law or the Partnership Agreement. In any event, the Court finds that the arbitrator was presented with evidence that the fees at issue in the Neufeld matter were never collected, and that, because of an unfavorable result, the Law Firm had written off bills in the Delphi matter far in excess of that requested by plaintiff. *See* Tanner Aff., Exh. K. Arbitration Transcript at 2368–78, 2375, 3927–43, 4235–42; Tanner Aff. at ¶¶ 15, 17. Such factual circumstances are more than adequate to justify the arbitra-

tor's decision to deny plaintiff's claims for money with respect to these client matters.

7. While plaintiff claims that because he was working at the Law Firm in 1994, the Firm could not simultaneously deprive him of both (1) Law Firm proceeds from charges billed prior to 1993 but received in 1994, and (2) Law Firm proceeds from charges billed in 1994 but received after 1994, the Partnership Agreement is clear that proceeds from the predecessor 1993 Law Firm would accumulate and be disbursed on an accrual basis to partners of the 1993 Law Firm, while proceeds from the successor 1994 Law Firm

Plaintiff's claim that the arbitrator erred in finding that the Law Firm was properly dissolved is also without merit. Indeed, while the arbitrator did not make specific findings in this respect, it is clear that plaintiff was deemed withdrawn from the Partnership in early January 1995 at the latest. As such he was ineligible to receive accounts receivable as of such date, and this outcome is unaffected by the subsequent termination of the Partnership or the manner in which firm succession took place. In any event, the Court further finds that the Termination Instrument and dissolution date complied with the requirements of the Partnership Agreement, and the arbitrator's construction of the Partnership Agreement's language is entitled to deference. *See* Partnership Agreement at ¶ 14(b); Arb. Tr. at 2419–21.

■ Finally, the Court dismisses plaintiff's argument that he was entitled to an accounting with respect to money owed to each of the other Law Firm partners in 1994. As is clear from the evidence presented by the parties, such accounting was both unnecessary to the arbitrator's decision and, in fact, any accounting would have actually reduced plaintiff's overall award received on the basis of the 1994 proceeds. In this sense, when all partners (including plaintiff) stipulated to the amount of their 1994 Basic Entitlement, the only matter left for the arbitrator to resolve was the apportionment of the 1994 Firmwide loss of well-over $400,000 to each partner of the Law Firm. Under the Partnership Agreement, plaintiff was required to cover approximately 4.2 percent of this loss from sums paid to him under his 1994 Basic Entitlement. *See* Tanner Aff. at ¶ 12. As is clear from the Clarified Award however, the arbitrator did not apportion plaintiff any part of this loss and rather awarded plaintiff his entire Basic Entitlement (excluding the Neufeld and Delphi Matters), without any deduction. As such, plaintiff can hardly complain at this juncture that the arbitrator's decision is unfavorable to him in this regard, and the Court will not vacate the Clarified Award on this basis.[8]

### CONCLUSION

For the foregoing reasons, defendants' motion to confirm the Clarified Award shall be and is hereby granted in its entirety and plaintiff's cross-motion to vacate the Clarified Award shall be and is hereby denied. Plaintiff's claims I–VI and XV–XVIII are accordingly dismissed. The parties shall appear at a Pre–Trial Confer-

---

would accumulate and be disbursed yearly on a cash basis. *See* Def. Add. Subm. at ¶ 8; Partnership Agreement at ¶ 3(b) (requiring that Accrued Professional Fees be computed or estimated at December 31, 1993 and that "[w]hen said Accrued Professional Fees at December 31, 1993 are received they shall belong to the partners herein who were partners of the firm prior to October 1, 1993"); Arb. Tr. at 1302–03 (noting that the drafter of the Partnership Agreement specifically intended to treat pre–1994 revenues on an accrual basis and post–1994 revenues on a cash basis); Arb. Tr. at 129–30, 2680–87, 2690–96, 4182–89.

**8.** While plaintiff also claims that the arbitrator did not address his claim in Count XIV that defendant Tanner had used Law Firm money to pay his personal guarantee of a minimum annual income to partners Haft and Simkin, this claim does not arise out of the Partnership Agreement and was therefore not properly subject to arbitration. In any event, an accounting on this basis was unnecessary because it is clear that such guarantees (and any other partner debt alleged by plaintiff) fall well short of $400,000, the amount of additional contributions by partners necessary to make the firm profitable in 1994. *See* Nimkoff. Aff. at ¶ 34. In this respect, as described above, so long as the Firm experienced a net loss in 1994, plaintiff has actually received a windfall by virtue of the arbitrator's decision not to deduct any portion of such loss from plaintiff's Basic Entitlement.

ence on June 18, 2001 in Courtroom 705, 40 Centre Street to discuss all remaining claims. In particular, as dismissal of plaintiff's Federal RICO claims eliminates the basis for this Court's subject matter jurisdiction, the parties shall be prepared to discuss whether this Court should dismiss this action without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

It is **SO ORDERED.**