**GULF PETRO TRADING COMPANY, INC., et al., Plaintiffs,**

v.

**NIGERIAN NATIONAL PETROLEUM CORPORATION, Defendant.**

No. CIV.A.3:03–CV–0406–G.

United States District Court, N.D. Texas, Dallas Division.

Oct. 23, 2003.

Robert K. Frisch, Law Office of Robert K. Frisch, Dallas, TX, for Plaintiffs.

John P. Bowman and Jennifer Lee Price, Fulbright & Jaworski—Houston, Houston, TX, and Paul B. Moore, Fulbright & Jaworski, Dallas, TX, for Defendant.

## MEMORANDUM ORDER

FISH, Chief Judge.

Before the court is the motion of the defendant Nigerian National Petroleum Corporation ("NNPC") to dismiss this case for failure to state a claim upon which relief can be granted, pursuant to FED. R. CIV. P. 12(b)(6), for insufficient service of process, pursuant to FED. R. CIV. P. 12(b)(5), and for lack of subject matter jurisdiction, pursuant to FED. R. CIV. P. 12(b)(1). For the reasons set forth in detail below, NNPC's motion to dismiss is granted.

### I. BACKGROUND

On June 10, 1993, NNPC, a Nigerian state-owned company, and Petrec International, Inc. ("Petrec") a division of the plaintiff Gulf Petro Trading Company, Inc., a Texas corporation, entered into a joint venture agreement, the object of which was the reclamation and salvaging of petroleum production discarded by NNPC in the course of its daily operations in Nigeria. See Second Amended Complaint to Confirm Arbitration Award for Enforcement of Arbitration Award and to Compel Further Arbitration Proceedings and for Declaratory Judgment ("Complaint") ¶ 9. To this end, NNPC and Petrec agreed to create a Nigerian company to be known as Petrec (Nigeria) Limited ("Petrec Nigeria"), in which Petrec would have a 75% ownership interest and NNPC a 25% ownership interest. Joint–Venture Agreement ("JVA") Preamble and §§ 3.1–3.2, attached to Complaint as Exhibit A.

Petrec Nigeria was formed on June 22, 1993. See Certificate of Incorporation of Petrec (Nigeria) Limited, attached to Complaint as Exhibit C.

The JVA contained an arbitration clause requiring that any disputes between Petrec and NNPC be resolved through arbitration, in accordance with the rules of the Chamber of Commerce and Industry of Geneva ("CCIG"). JVA §§ 18.1–18.2. The JVA itself was to be governed by Nigerian Law. Id. § 19.1.

According to Petrec, NNPC breached the JVA by failing to invest $650,000 in Petrec Nigeria and by failing to give Petrec Nigeria access to the areas needed to conduct its operations. See Complaint ¶ 14. On November 23, 1998, Petrec—acting pursuant to the arbitration clause in the JVA—filed a demand and claim for arbitration with the CCIG. Id. ¶ 15; CCIG Partial Award ("Partial Award") at 7, attached to Complaint as Exhibit D. After some delay, the arbitration commenced in Geneva and, by agreement of parties, the proceedings were bifurcated. See Complaint ¶ 15. Under this bifurcation, the Arbitration Panel (the "Panel") would first decide the issue of NNPC's liability, turning afterwards, if necessary, to the amount of damages.[1] Partial Award at 10. Petrec alleged damages in the amount of almost $1.5 billion. See Complaint ¶ 19.

On July 5, 2000, after a full evidentiary hearing on liability, the Panel issued a partial award in favor of Petrec. See Complaint ¶ 15; Partial Award at 1, 40. The Panel found, in pertinent part, that Petrec had "locus standi to submit claims" arising out of the JVA, that NNPC "failed to contribute to the realization" of the JVA, and that NNPC failed to fulfill its

---

1. The Panel consisted of Mr. Andrew W.A. Berkeley, designated by Petrec, Mr. Ian L. Meakin, designated by the CCIG Arbitration Committee after NNPC failed to respond within the time allotted to name an arbitrator, and Professor Hans van Houtte, designated by

obligation to invest $650,000 in Petrec Nigeria. Partial Award at 40; *see also* Complaint ¶ 15.[2] Having determined that NNPC breached its contract with Petrec, the Panel determined that it would "rule on the question of quantum and all other prayers for relief at a later date." Partial Award at 40.

The hearing on the amount of damages was held in London, England between January 23rd and 29th, 2001. *See* CCIG Final Award ("Final Award") at 2, *attached to* Complaint as Exhibit E. On the final day of the hearings, NNPC challenged the standing of Petrec International Inc., a Texas corporation formed February 28, 2000 (*i.e.,* after execution of the JVA and the demand for arbitration), to make claims against NNPC. *See* Complaint ¶¶ 12, 17; Final Award at 15–18. On October 9, 2001, after reviewing the parties' arguments, the Panel held, in pertinent part, that because Petrec was not a Texas corporation, it did not have standing or capacity to make and/or to sustain the claims against NNPC. Complaint ¶ 17.[3]

Petrec appealed the Final Award to the Federal Court in Switzerland ("Swiss court") in early 2002. *See* Complaint ¶ 18. On April 3, 2002, the Swiss court issued a decision rejecting Petrec's arguments for cancelling the Final Award and, in so doing, upheld the Panel's determination that Petrec lacked standing to maintain its claims. *See* Decision of the Swiss Federal Court ("Swiss Decision") at 11, ¶ C4(b)(cc), *attached to* Complaint as Exhibit F.

Undaunted, Petrec brought this action on February 26, 2003 to confirm and enforce the Partial Award rendered by the Panel during the liability phase of the arbitration. Complaint ¶ 20. Notwithstanding the decision of the Panel in the Final Award and the later judgment of the Swiss court confirming the Final Award, Petrec specifically asks that the court: (1) confirm the Partial Award as the judgment of this court, including the $650,000 in favor of Petrec Nigeria; (2) either determine and assess quantum damages or, alternatively, order and compel NNPC to further arbitration on the issue of damages; and (3) award attorney's fees or "other and further relief" to Petrec. See *id.* ¶ 20(A–N).

Responding to Petrec's complaint, NNPC filed the instant motion to dismiss the case for failure to state a claim, for insufficient service of process, and for lack of subject matter jurisdiction. Defendant's Motion to Dismiss ("Defendant's Motion") at 1. In support of their respective positions on the motion to dismiss, both sides have filed supplemental briefs; those supplemental briefs contain opinions by eminent former Justices of the Nigerian High Court offering radically different interpretations of Nigerian law.[4] *See* Plaintiffs' Supplemental Brief in Support of Plaintiffs' Response to Defendant's Motion to Dismiss; Defendant's Reply to Plaintiffs' Supplemental Brief in Support of Plaintiffs' Response to Defendant's Motion to Dismiss.

---

the CCIG as the Chairman of the Panel. *See* Partial Award ¶ 3.

2. For a complete description of the effect of the Panel's Partial Award, *see* Partial Award at 40. *See also* Decision of the Swiss Federal Court at 2, ¶ B, *attached to* Complaint as Exhibit F.

3. For a complete description of the Panel's ruling in the arbitration, *see* Final Award at

33. *See also* Decision of the Swiss Federal Court at 2–4, ¶ B.

4. Petrec was the first party to move for leave to file a supplemental brief. Leave was granted by the court on July 1, 2003. The court also granted, on August 27, 2003, NNPC's motion for leave to file a response to Petrec's supplemental brief.

## II. *ANALYSIS*

### A. *Motion to Dismiss for Failure to State a Claim*

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." A motion under Rule 12(b)(6) should be granted only if it appears beyond doubt that the plaintiff could prove no set of facts in support of its claims that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Thompson v. Goetzmann*, 337 F.3d 489, 495 (5th Cir. 2003); see also *Southern Christian Leadership Conference v. Supreme Court of the State of Louisiana*, 252 F.3d 781, 786 (5th Cir.) (motions to dismiss for failure to state a claim are viewed with disfavor and are rarely granted), *cert. denied*, 534 U.S. 995, 122 S.Ct. 464, 151 L.Ed.2d 381 (2001).

■ In determining whether dismissal should be granted, the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. See *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir.2002); *Brown v. Nationsbank Corporation*, 188 F.3d 579, 585–86 (5th Cir.1999), *cert. denied*, 530 U.S. 1274, 120 S.Ct. 2740, 147 L.Ed.2d 1004 (2000). When it is apparent from the face of the complaint that an affirmative defense applies to bar a claim, dismissal for failure to state a claim upon which relief may be granted is appropriate. *Kansa Reinsurance Company, Ltd. v. Congressional Mortgage Corporation of Texas*, 20 F.3d 1362, 1366 (5th Cir.1994); *Zavala v. United Parcel Service*, 2000 WL 20987, at *1 (N.D.Tex. Jan. 12, 2000).

■ NNPC bases its Rule 12(b)(6) motion on the contention that Petrec's action is barred by the statute of limitations articulated in Article 12(1) of the Nigerian National Petroleum Corporation Act (the "NNPC Act"). Brief in Support of Defendant's Motion to Dismiss ("Defendant's Brief") at 6 (citing NNPC Act, CAP 320 LFN 1990, *attached to* Defendant's Brief as Appendix A). The NNPC Act provides that "[n]otwithstanding anything in any other enactment, no suit against the Corporation [*i.e.,* the NNPC] ... shall lie or be instituted in any court unless it is commenced within **twelve months** next after the act, neglect or default complained of ...." NNPC Act § 12(1)(emphasis added); see also Defendant's Motion ¶ 4; Defendant's Brief at 6. The causes of action on which Petrec's claims rest, NNPC argues, are predicated on: (1) the issuance of the Partial Award in arbitration on July 5, 2000, and (2) the issuance of the Final Award in arbitration on October 9, 2001. Defendant's Motion ¶ 4; see also Complaint ¶¶ 15, 17. Because Petrec filed this action February 26, 2003, more than 12 months after the issuance of either the Partial or Final Award, this action should—according to NNPC—be dismissed for failure to state a claim. Defendant's Motion ¶ 4.

In response, Petrec contends that because this is an action arising from an arbitration involving a breach of contract for commercial purposes, it falls outside the scope of the NNPC Act and, instead, within a six-year limitations period that governs English commercial transactions. *See* Response to Defendant's Motion to Dismiss ("Plaintiffs' Response") at 6–7; see also Defendant's Reply to Plaintiffs' Response to Motion to Dismiss ("Defendant's Reply") at 2–3. The English limitations period is imported into Nigerian law under the gap-filling provisions of Nigeria's Interpretation Act, which provides that English statutes and common law will apply when the matter is not otherwise addressed by Nigerian federal law. Interpretation Act § 32, CAP 192 LFN 1990, *located in* Appendix to Complaint to Confirm Arbitration Award for Enforcement of Arbitration Award and to Compel Fur-

ther Arbitration Proceedings and for Declaratory Judgment ("Appendix to Complaint") at 74–83. Petrec further argues that NNPC's actions following the issuance of the Final Award, including a request by NNPC to CCIG for further interpretations of the award, tolled the statute. Plaintiffs' Response at 7. Because any Final Award is subject to both an appeal and an enforcement action, Petrec contends, the arbitration process was not complete until the Swiss court decision was given on April 3, 2002. See *id.*

■ The assertions of all parties regarding the applicable statute of limitations are wide of the mark. Which limitations period applies is governed neither by Nigerian substantive law [5] nor by English law on commercial transactions,[6] but by the Convention on the Recognition and Enforcement of Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, *implemented by* 9 U.S.C. §§ 201–208 (the "Convention"). *See also* Convention, Art. I(1) ("[The Con-

vention] shall ... apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.").[7] In order to confirm or enforce the CCIG arbitration decision[s], the three-year limitation period articulated in the statute implementing the Convention must be satisfied. Section 207 of Title 9, United States Code, provides:

> Within **three years** after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207 (emphasis added).[8]

In adhering to the tenets of the Convention, this court is bound to enforce a three-year limitations period. *Id.* Because this

---

5. Contrary to the assertions of NNPC, the one-year statute of limitations contained in the NNPC Act does not apply to this case. The parties clearly contracted to apply Nigerian substantive law in the event of a dispute over, among other things, the reclamation, disposal, and salvaging of petroleum products, or even the governmental, environmental, or industrial power of the NNPC. *See* JVA § 19.1. However, this is not a dispute arising from the construction, validity, and performance of the Petrec–NNPC contract—which indeed was the subject of the dispute underlying the arbitration awards. This is a dispute about enforcing and confirming those arbitration awards. While the statute of limitations language in the NNPC Act § 12 applies to NNPC's "act, neglect or default," it does not apply where NNPC contractually and voluntarily submitted to the process of arbitration. Enforcement of the arbitration decision is the issue before this court.

6. Contrary to the assertions of Petrec, the six-year limitations period that governs English commercial transactions is similarly inapplicable in this case. Petrec offers no evidentia-

ry support or legal authority for its assertion that "[t]he parties have chosen the English Law of Contracts and its six year statute of limitations by virtue of the Nigerian Interpretations Act of 1964." Plaintiffs' Response at 7.

7. Both the Partial and Final Awards in this dispute should be characterized as "nondomestic," as both awards were issued in Switzerland and arose from an American corporation's contract with a Nigerian state-owned corporation calling for performance in Nigeria.

8. The court notes that Switzerland, Nigeria, and the United States are each signatories to the Convention. When a country such as Nigeria becomes a signatory to the Convention, by the very provisions of the Convention, the signatory State must have contemplated enforcement actions in other signatory states. See, *e.g., Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 578 (2d Cir.1993).

action was commenced on February 26, 2003, within three years after either of the arbitral awards were "made," [9] the statute of limitations does not bar this action. Dismissal of this case under Federal Rule of Civil Procedure 12(b)(6) is therefore unwarranted.[10]

### B. Motion to Dismiss for Insufficient Service of Process

 Service of process on an agency or instrumentality of a foreign state such as NNPC must be made pursuant to the Foreign Sovereign Immunities Act, which provides:

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request, or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

28 U.S.C. § 1608(b).[11] Section 1608 provides the exclusive procedure for service of

---

9. Although the parties may dispute the date on which arbitral award was "made," i.e., whether the limitations period began to run when the Partial Award was issued on July 5, 2000, when the Final Award was issued on October 9, 2001, or when the Swiss court issued its opinion on April 3, 2002, the result is the same—each falls within the three-year limitation period. While not dispositive on the issue, Second Circuit precedent suggests that the limitations period likely began to run when the award was "decided by the arbitrators"—i.e., the date of the Final Award, October 9th, 2001. See, e.g., Seetransport, 989 F.2d at 581. As each of these possible dates is within the three-year limitations period, this court need not consider whether that period was tolled by the arbitration process or the decision of the Swiss court.

10. For the purposes of ruling on NNPC's Rule 12(b)(6) motion, the court did not consider the parties' supplemental pleadings; therefore, the court need not convert this motion into one for summary judgment. See Carter v. Stanton, 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972) (when matters outside the pleadings are considered by a district court on a motion to dismiss, Rule 12(b) requires the court to treat the motion as one for summary judgment and to dispose of it as required by Rule 56); accord Jackson v. Procunier, 789 F.2d 307, 310 (5th Cir.1986). Cf. Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1017–18 (5th Cir.1996) (in deciding a motion to dismiss, the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken).

11. It is undisputed that NNPC, as a wholly-owned foreign state corporation organized under the laws of Nigeria, qualifies as an agency or instrumentality of a foreign state as defined in 28 U.S.C. § 1603(a). See Complaint ¶ 2 ("For purposes of this litigation, [NNPC] is an agency or instrumentality of the country of Nigeria.").

process on a foreign state or its political subdivisions, agencies, or instrumentalities. 4B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1111, at 123 (3d ed.2002).

NNPC argues that the court should dismiss this case because Petrec's attempted service of process was not effective under the FSIA. Defendant's Motion at 4–5. In this case, there was no "special arrangement," no authorized agent in the United States, and no applicable international convention. § 1608(b)(1)-(2). Absent a special arrangement, agent, or convention, Petrec must have served papers via letter rogatory, through the clerk of the court, or as directed by the court, through methods that were "reasonably calculated to give actual notice." § 1608(b)(3).

Instead of following the statute, Petrec filed its complaint and then, without seeking the assistance of the clerk of court, itself addressed and dispatched the summons and complaint. Defendant's Motion at 5; *see also* Plaintiffs' Response at 3 (acknowledging "the Summons and Service were not sent by the Clerk of the Court"). As argued by NNPC, therefore, Petrec failed to strictly comply with § 1608(b) in serving NNPC. *See* Defendant's Motion at 4–5.

■ The Fifth Circuit has rejected a strict reading of § 1608(b), however, and instead applies a "substantial compliance" test. *Magness v. Russian Federation,* 247 F.3d 609, 616–17 (5th Cir.), *cert. denied,* 534 U.S. 892, 122 S.Ct. 209, 151 L.Ed.2d 149 (2001). In *Magness,* the Fifth Circuit determined that actual notice of suit overrides technical deficiencies in service, *i.e.,* that substance overrides form. See *id.* at 617. "[S]ubstantial compliance with the provisions of service upon an agency or

instrumentality of a foreign state—that is, service that gives actual notice of the suit and the consequences thereof to the proper individuals within the agency or instrumentality—is sufficient to effectuate service under section 1608(b)." *Id.* at 616. And, significantly for this case, federal courts have upheld service where the serving party "substantially complied" with the FSIA, even though the complaint was not dispatched by the clerk of the court. See, *e.g., Straub v. A P Green, Inc.,* 38 F.3d 448, 453 (9th Cir.1994) (failure of a party to have the complaint dispatched by the clerk of court did not, under FSIA, constitute lack of substantial compliance); *Banco Metropolitano, S.A. v. Desarrollo de Autopistas y Carreteras de Guatemala,* 616 F.Supp. 301, 304 (S.D.N.Y.1985) (service found to be sufficient under FSIA even though the complaint was not translated and summons and the complaint were not dispatched by the clerk of court); *Obenchain Corporation v. Corporation Nacionale de Inversiones,* 656 F.Supp. 435, 437–38 (W.D.Pa.1987) (although the plaintiff itself served the complaint rather than having the clerk of court perform that function, that fact did not preclude assertion of personal jurisdiction under FSIA as long as the fact and substance of the pending litigation was conveyed).

■ Under the substantial compliance test, the pivotal factor is whether the defendant received actual notice. *Magness,* 247 F.3d at 617. NNPC, citing *Magness,* insists that it is not enough that *somebody* (*i.e.,* Sena Anthony) in the state agency or instrumentality knew of the complaint, and maintains that NNPC did not have actual notice of the suit because neither its Chairman nor its Managing Director was served.[12] *See* Defendant's Brief at 10–15.

---

12. NNPC erroneously argues that "[t]he Nigerian law specific to NNPC identifies the proper persons to be served ...." Defendant's Reply at 8; *see also* Defendant's Brief at 14. In fact, "[h]ow service may be made

'is a federal question to be determined according to [U.S.] federal law.'" *Dodco, Inc. v. American Bonding Company,* 7 F.3d 1387, 1388 (8th Cir.1993) (per curiam); see also *National Equipment Rental, Ltd. v. Szukhent,*

In response, Petrec asserts that NNPC had actual notice of the suit, given that Sena Anthony, NNPC's Group General Manager, Corporate Secretariat and Legal Division, was served directly. Plaintiffs' Response at 3; *see also* Defendant's Reply at 9 n. 5.

■ In the court's opinion, there can be no doubt that NNPC had actual notice of the suit. Petrec directly served more than a "somebody"; it served a General Manager of NNPC's Legal Division. "Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service." See, *e.g.*, *Montclair Electronics, Inc. v. Electra/Midland Corporation*, 326 F.Supp. 839, 842 (S.D.N.Y.1971); *American Football League v. National Football League*, 27 F.R.D. 264, 269 (D.Md.1961). Sena Anthony is one such individual. Moreover, NNPC has not denied that it has had actual notice of the suit; indeed, it has made a timely motion to dismiss the second amended complaint. See, *e.g.*, *Sherer v. Construcciones Aeronauticas, S.A.*, 987 F.2d 1246, 1250 (6th Cir.) (finding actual notice where defendant hired counsel and moved to dismiss the complaint), *cert. denied*, 510 U.S. 818, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993). In light of NNPC's receipt of actual notice, the court will not—by quashing service of process—allow procedure to trump substance. In harmony with the decision in *Banco Metropolitano*, this court concludes that

"[g]iven the nature of the issues presented and the problems intended to be addressed by the FSIA, strict enforcement of its technicalities here would be inappropriate." 616 F.Supp. at 304. Dismissal for insufficient service of process, under F.R. CIV. P. 12(b)(5), is therefore denied.

### C. Motion to Dismiss for Lack of Subject Matter Jurisdiction

■ Petrec's petition to recognize and enforce (*i.e.*, "confirm") the Partial Award, or to set aside or modify the Final Award, falls within the purview of the Convention on Recognition and Enforcement of Arbitral Awards. 21 U.S.T. 2517, *implemented by* 9 U.S.C. §§ 201–208.[13] Most cases involving the Convention concern enforcement and recognition of arbitration awards or defenses against enforcing those awards. Petrec's case is unique, however. Petrec seeks to enforce the preliminary Partial Award that was, in essence, vacated by the Final Award. Because the Final Award disallows Petrec any recovery whatsoever, Petrec asks this court: (1) to enforce and recognize the Partial Award; (2) to set aside or modify the Final Award and assess quantum damages; or, in the alternative, (3) to compel NNPC to further arbitration on the issue of damages. *See* Complaint at 14. Impliedly, if not explicitly, Petrec asks the court to circumvent both the Panel's Final Award and the Swiss court's decision confirming that award. See *id.* at 11.

375 U.S. 311, 316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) (finding that federal law applies to determine whether a person is an agent for service under FED. R. CIV. P. 4).

**13.** NNPC contends that because Petrec failed to satisfy a "jurisdictional prerequisite," this action should be dismissed under FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction. Defendant's Motion at 4. NNPC argues that Petrec failed to provide it 30 days notice

prior to bringing suit, as required by the NNPC Act § 12(2). Defendant's Brief at 8–10. In response, Petrec offers several documents to support its assertion that NNPC was, in fact, served notice of its continuing claims. Plaintiffs' Response at 1–3, Exhibits A–D. The parties' discussion of Nigerian law is irrelevant, however, to the determination of the jurisdictional issue before the court—which is governed by the Convention.

There are at least two reasons, however, why the court cannot grant Petrec the relief it seeks. First, the Convention precludes this court from setting aside or modifying the Final Award. Second, the doctrines of *res judicata* and international comity preclude the court from revisiting the enforceability of the Partial Award.

### 1. Setting Aside or Modifying the Final Award

 Under the Convention, a foreign court is empowered to enter one of two judgments when faced with an arbitral award issued in another nation: (1) enforce the award,[14] or (2) refuse to enforce the award upon specified conditions.[15] The Convention, however, precludes a foreign court from setting aside or modifying an arbitral award. See *Karaha Bodas Company, L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (5th Cir.2003); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir.1997) (finding that domestic arbitral law may only be applied by a court "under whose law the arbitration was conducted"), *cert. denied*, 522 U.S. 1111, 118 S.Ct. 1042, 140 L.Ed.2d 107 (1998). Article V(1)(e) of the Convention provides that a court may refuse enforcement of an award that "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." In *Yusuf*, the Second Circuit provided a highly useful interpretation of Art. V(1)(e) and of the Convention generally:

> [W]e conclude that the Convention mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought. The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief. *See* Convention art. V(1)(e). However, the Convention is equally clear that when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.

126 F.3d at 23. Moreover, the Fifth Circuit recently arrived at the same conclusion:

> Under the Convention, "the country in which, or under the [arbitration] law of which, [an] award was made" is said to have *primary* jurisdiction over the arbitration award. All other signatory States are *secondary* jurisdictions, in which parties can only contest whether that State should enforce the arbitral award.

*Karaha Bodas*, 335 F.3d at 364 (italics and brackets in original). According to this court's reading of the Convention, and in keeping with the rulings in *Yusuf* and *Karaha Bodas*, United States federal courts cannot set aside or modify an arbitral award made in another nation.

In *Spier v. Calzaturificio Tecnica, S.p.A.*, a case with similar facts, the United States District Court for the Southern District of New York concluded that an arbitration award rendered in Italy that had been vacated by the Italian courts was not

---

**14.** Generally, the Convention requires contracting states to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." Convention Art. III.

**15.** Article V of the Convention provides that a court may refuse to enforce an arbitration award "only" upon proof of the conditions specified therein. *Id.* Art. V(1).

entitled to enforcement under the Convention. 71 F.Supp.2d 279 (S.D.N.Y.1999). The *Spier* court found that there was no basis under the Convention to apply United States law because the plaintiff and the Italian company contracted in a foreign state that their dispute would be arbitrated there, the governing agreements made no mention of United States law, and nothing suggested that the parties intended United States domestic arbitral law to govern. *Id.* at 288.

Under the rationale in *Spier*, with which this court agrees, domestic law cannot be applied in this case, because Petrec and NNPC contracted that their disputes would be arbitrated in Switzerland, applying Nigerian law, and nothing suggests that United States domestic law is to govern their disputes. Exercising jurisdiction in this case to set aside or modify the Final Award would involve setting aside or modifying the Panel's award or the judgment of the Swiss court or both. "[I]t is not the district court's burden ... to protect [a party] from all the legal hardships it might undergo in a foreign country as a result of this foreign arbitration or the international commercial dispute that spawned it." *Karaha Bodas*, 335 F.3d at 369.

For the reasons discussed above, the authority to grant Petrec the relief it seeks

lies well beyond the limited subject matter jurisdiction conferred upon this court by the Convention and its implementing domestic legislation. See *Spier*, 71 F.Supp.2d at 288 n. 6. In other words, Petrec cannot be heard to argue that the Swiss court's decision should not be recognized on the ground that an American court would reach a different result with respect to the award if it had been rendered in the United States. See *id.* at 288. A practice of modifying or amending a foreign arbitral award, which has been upheld by an foreign court, could disrupt the reliability of international arbitration established under the Convention over four decades.[16] To rule otherwise would encourage forum shopping among countries willing to modify or amend arbitration awards. See *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 n. 2 (2d Cir.1999) (suggesting that the "mechanical application of domestic arbitral law to foreign awards under the Convention would seriously undermine finality and regularly produce conflicting judgments").

#### 2. *Recognizing and Enforcing the Partial Award* [17]

▮ Whether or not the Partial Award in favor of Petrec was enforceable following the Final Award is an issue that was addressed by the Swiss court.[18] The Swiss

---

**16.** For example, "[i]f a Massachusetts seller and a French buyer agree to arbitrate in London, they normally expect proceedings in England, subject to judicial review by English courts, rather than having one side's home town judges disregard the contractually-selected venue in order to compel arbitration or to vacate an award in Paris or Boston." William W. Park, *Award Enforcement Under the New York Convention*, 688 PLI–LIT 573, 603 (2003). "In international contracts, parties choose arbitration for a number of reasons, most notably because it avoids 'hometown justice'—that is, it provides a neutral forum that avoids litigation in either party's home court." Christopher R. Drahozal, *Enforcing Vacated International Arbitration Awards: An*

*Economic Approach*, 11 Am. Rev. Int'l Arb. 451, 453 (2000).

**17.** Petrec submits that because both the arbitral Panel and the Swiss court "misunderstood the applicable principles of Texas Law ..., [Petrec has] been deprived of their entitlement to damages pursuant to the Partial Award." Complaint ¶ 20(C).

**18.** By concluding in the Final Award, at 33, that "Petrec ... cannot maintain its claims," the Panel disallowed any recovery under the Partial Award. The Swiss court noted that "[Petrec] is directly affected by the decision [*i.e.*, the Final Award] being appealed, which would forbid it from bringing claims and

court rejected Petrec's arguments and sustained the ruling of the Final Award that Petrec had no inherent capacity to maintain its claims. *See* Swiss Decision at 2–4, ¶ B; Final Award at 28. Because the issue has already been decided by the Swiss court, a review of that issue by this court would violate principles of *res judicata* and international comity.[19]

■ The theory often used to account for the *res judicata* effects of foreign judgments is that of comity, which is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District of Iowa*, 482 U.S. 522, 544 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)); see also *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1004 (5th Cir.1990). "[T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity." *Laker Airways Limited v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984). The Supreme Court has long held that, under principles of international comity, a foreign court's determination of a matter is conclusive in a federal court where: (1) the foreign judgment was rendered by a court of competent jurisdiction, which had jurisdiction over the cause and parties; (2) the judgment is supported by due allegations and proof; (3) the relevant parties had an opportunity to be heard; and (4) the foreign court follows civilized procedural rules. *Hilton*, 159 U.S. at 205–06, 16 S.Ct. 139; see also *Hartford Fire Insurance Company v. California*, 509 U.S. 764, 817, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1148 (5th Cir.1990); RESTATEMENT (SECOND) OF CONFLICT OF LAWS: Recognition of Foreign Nation Judgments § 98 cmt. c (1971) (citing *Hilton* as the seminal decision on the recognition of foreign judgments). Finally, "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Overseas Inns*, 911 F.2d at 1148 (citation omitted); see also *Laker Airways*, 731 F.2d at 937–38.

The Swiss court's ruling clearly satisfies each of the *Hilton* elements. First, the rendering court was one of competent jurisdiction, which had jurisdiction over the cause of action and the parties. Switzerland has a legitimate and reasonable interest in providing a forum for this suit; the NNPC–Petrec contract called for arbitration there without specifying a forum for appeal and, as discussed previously, the Convention specifies that only a court in "the country in which ... that award was made" (in this instance, a Swiss court) can set aside or modify the Final Award. *See* Convention, Art. V(1)(e). The Swiss court, in conformity with the foregoing, held: "Brought timely, in form prescribed by law, the instant appeal is therefore in principle qualified to be heard." Swiss Decision at 6, ¶ C2(b) (citations omitted).

which immediately adjourns the pending arbitration proceedings." Swiss Decision at 6, ¶ 2(b). Because the Swiss court was unpersuaded by Petrec's arguments (*e.g.*, that Petrec had juridical existence contrary to the ruling of the arbitral Panel and that the public policy of *res judicata* barred the arbitral Panel from finding otherwise) to cancel the Final Award in favor of the Partial Award, it rejected Petrec's appeal.

19. In its complaint, Petrec highlighted the Swiss court's holding that Petrec "did not have standing or capacity to make and/or to sustain the claims against NNPC." Complaint ¶ 17.

Second, the Swiss court's factual and legal conclusions appear to be supported by due allegations and proof. The plaintiffs have included in the record here various documents that were considered and referenced by the Swiss court in its ruling, including, but not limited to, the NNPC–Petrec contract, the Partial Award, and the Final Award. *See generally* Complaint, Exhibits A, D, and E. The Swiss court's decision also rests on the allegations, claims, and defenses outlined by each party in the briefs they filed in that court. *See* Swiss Decision at 4–13, ¶ C.

Third, all relevant parties had an opportunity to be heard by the Swiss court. Both Petrec and NNPC were parties to the Swiss court proceeding. *See* Complaint ¶ 18; Defendant's Brief at 4; Swiss Decision at 4–5, ¶ C. NNPC filed a motion to order Petrec to furnish surety bonds on March 1, 2002, and then filed its answer and brief on March 4, 2002. See *id.*

Fourth, this court, having reviewed the opinion of the Swiss court, concludes that the Swiss court followed civilized procedural rules. Petrec cannot seriously assert that there was not timely notice and opportunity to defend or that the proceedings were not rendered according to a civilized jurisprudence. See, *e.g., Karaha Bodas*, 335 F.3d at 371–72 (recognizing Switzerland as "the paramount country of primary jurisdiction" for the purposes of appealing an arbitration award).

Finally, acceptance of the Swiss court's ruling would not be "contrary or prejudicial to the interest of the nation called upon to give it effect." *Overseas Inns*, 911 F.2d at 1148 (quoting *Somportex Limited v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972)). The contractual provision which binds the parties sets venue for arbitration in Geneva, Switzerland. JVA § 18.2. The arbitration was held, and the award made, in Switzerland. Most importantly, Petrec itself invoked the jurisdiction of the Swiss court system to appeal the Final Award. See generally *In re Aktiebolaget Kreuger & Toll*, 20 F.Supp. 964, 969–70 (S.D.N.Y.1937) (noting the fact that an American creditor had invoked the jurisdiction of the Swedish courts strengthened the court's decision to apply the doctrines of international comity and *res judicata* to prevent the re-litigation of certain bankruptcy issues). Therefore, the Swiss court's determination that the Final Award is enforceable—even against the Partial Award—must be recognized by this court as a matter of *res judicata* and international comity.[20] Dismissal for lack of subject matter jurisdiction, pursuant to F.R. Civ. P. 12(b)(1), is granted.

## III. CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss the plaintiffs' complaint pursuant to Fed R. Civ. P. 12(b)(1) is **GRANTED**.[21]

**SO ORDERED.**

---

**20.** As the Supreme Court has indicated, "[t]he utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." *Mitsubishi Motors Corporation v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 639 n. 21, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Even though the *Mitsubishi* Court was primarily addressing the arbitrability of disputes raising antitrust issues, its guidance nevertheless applies here, where exercise of a court's jurisdictional power threatens to upset the Convention's assignment of limited, distinct roles to national courts in the confirmation and enforcement process. *Karaha Bodas*, 335 F.3d at 373 n. 62.

**21.** Because its complaint must be dismissed for want of subject matter jurisdiction under

FED. R. CIV P. 12(b)(1), Petrec's requests for further relief in this matter are denied as moot.